Angel CLARK; Melvin Thomas; Frederick Anderson; Mary Roe; Jamie Luby, by her next friend Christine M. Luby; Tashiana Elliott, by her next friend, Barbara J. Elliott; Duane Cuthrell; Alfred Colon; Jane Doe; Lynette Chronister, by her next friend Karen Burgess; Lisa Becker; Jeff Dixon; Titus Clark; Sherry Stuffle; Charles Kennedy, II

v.

Joseph CLABAUGH, Sergeant; Douglas Riley, Sergeant; Randy Whitson, Sergeant; Devis Leese, Sergeant; Ken Smith, Officer; Dwayne Smith, Officer; David Zumbrum, Officer; Wayne Martin, Officer; Officer Bigham; Officer Hess; J.D. Roser, Officer; Hanover Police Department; County of York; Carl Boyer, Conewago Township Police Department; Randy Chronister; Scott Leese; Daniel Messinger; Jeffrey Parks; James Swartz; Jeffrey Trish; Donald Wilson; James Winebrenner, All Individual defendants are sued individually only,

Angel Clark, Melvin Thomas, Frederick Anderson, "Mary Roe", Jamie Luby, Tashiana Elliott, Duane Cuthrell, Alfred Colon, "Jane Doe", Lynette Chronister, Lisa Becker, Jeff Dixon, Titus Clark, Sherry Stuffle; Charles Kennedy, II, Appellants.

No. 93–7471.

United States Court of Appeals, Third Circuit.

Argued Jan. 25, 1994.

Decided April 8, 1994.

See also 426 Pa.Super. 396, 627 A.2d 735.

**1292**

Stefan Preser, Philadelphia, PA, Richard Gutman (Argued), Carlisle, PA, for appellants.

John C. Dowling (Argued), David B. Dowling, Rhoads & Sinon, Harrisburg, PA, for appellees.

Before: MANSMANN, NYGAARD and SEITZ, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

A racial riot in Hanover, Pennsylvania, during the summer of 1991 provides the setting for this appeal by the members of an interracial youth group who claimed numerous violations of their civil rights by public officials when the members were attacked by white "bikers" and townspeople. The district

1. The district court explicitly deleted from the caption the names Mayor W. Roy Attlesberger, Chief of Police Gerald Lippy and Hanover Borough in its May 6, 1993 order. For this reason, those names do not now appear in the caption. The June 4, 1993 amending order makes it clear that final judgment was also entered in favor of Police Officer Carl Boyer. The June 4th amending order provides:

   Final judgment is hereby entered on paragraphs 6 and 7 [pertaining to Mayor Attlesberger, Police Chief Lippy and Hanover Borough] of the Order of May 6, 1993. *Final judgment is also entered against all plaintiffs on the 42 U.S.C. § 1986 (failure to protect) claim.*

   (emphasis added). Despite this amendment, it appears that Police Officer Carl Boyer's name was never deleted from the caption. Because we will order vacatur of the district court's order, the district court should reinsert the names of Defendants Attlesberger, Lippy and Hanover Borough into the caption.

court granted summary judgment in favor of the Borough of Hanover, Mayor W. Roy Attlesberger, Chief of Police Gerald Lippy and Conewago Township Police Officer Carl Boyer on all 42 U.S.C. § 1986 civil rights claims charged against them, and certified this appeal pursuant to Fed.R.Civ.P. 54(b).[1]

In responding to the motion for summary judgment, the plaintiffs had relied almost exclusively on a Pennsylvania State Police Report, generated from a state police investigation conducted into the circumstances of the racial disturbances, to establish the elements of their claims. The issues before us concern the propriety of the district court's consideration of the PSP Report, which is unsworn and contains opinions based on hearsay, in deciding the summary judgment motions, as well as the Report's sufficiency in raising a genuine issue of material fact as to 42 U.S.C. § 1986 liability. With regard to the latter issue, we focus on the requisite element of "knowledge" of a § 1985 conspiracy in establishing a § 1986 civil rights claim.[2]

■ We exercise plenary review over this challenge to the district court's summary judgment order, and will view all inferences drawn from the evidence in the light most favorable to the party which opposed the motion. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993).

2. The plaintiffs brought this action in the district court under the Fourth and Fourteenth Amendments to the United States Constitution, the Civil Rights Act of 1870, 42 U.S.C. § 1981, and the Ku Klux Klan Act of 1871, 42 U.S.C. §§ 1983, 1985 and 1986. The district court exercised federal question jurisdiction under 28 U.S.C. §§ 1331, 1343(a). The district court directed entry of summary judgment pursuant to Fed.R.Civ.P. 54(b) on May 6, 1993, which was certified for appeal on May 7, 1993; the court amended its order on June 4, 1993. Our jurisdiction is based upon 28 U.S.C. § 1291.

   This appeal pertains only to the Rule 54(b) grant of summary judgment on the § 1986 claims. Outstanding claims of racially motivated conspiracy, discriminatory arrests, arrests without probable cause, excessive force and malicious prosecution remain before the district court.

## I.

Hanover Center Square, in Hanover Borough, York County, Pennsylvania, was the site of a disgraceful two-day spectacle of racial unrest which ignited between the members of a self-styled interracial youth group on the one side, and a band of all-white motorcyclists and a crowd of townspeople on the other. The incidents which gave rise to this cause of action were preceded by a rumor, which apparently circulated about town for two weeks, that the white bikers were conspiring to assemble in the Square on the evening of July 13, 1991, to drive the interracial group, which regularly congregated and socialized in the Square, out of Hanover. In fact, on the evening of July 13th, the interracial group and the white bikers did assemble in the Square, apparently in anticipation of and prepared for a hostile confrontation.[3] The presence of the two groups, as well as, presumably, the effect of the rumors, incited the participation of many townspeople who had also gathered as spectators and as supporters of the bikers. The series of racial disturbances which ignited from that point on July 13th through the evening of July 14th did not involve serious bodily injury or extensive property damage, despite the grave potential for both.

In short, by midnight of July 13th, a volatile assemblage of approximately 40 interracial youth group members, twelve or more white bikers and approximately 200 to 300 townspeople had gathered in the Square. A racially charged altercation and exchange of taunts, challenges, accusations and obscenities ensued. Only six Hanover police officers were present. The officers formed a police line separating the two factions, which soon proved ineffectual. The bikers and townspeople broke through the line, and the interracial group retreated to an apartment on the Chestnut and Carlyle Streets intersection, where they had frequently congregated. Although the white bikers apparently were not involved in any further confrontation, over 500 townspeople congregated on the street outside this apartment building on the evening of July 14th to confront members of the interracial group gathered on the rooftop. Again, a racial altercation ensued, but this time the two factions threw objects such as stones and bottles at each other. Police officers ascended the fire escape, arrested all the members of the interracial group present on the rooftop and charged them with disorderly conduct. This scenario was repeated when a second group of interracial youths gathered on the rooftop and entered into the same type of altercation with the crowd below. This time the police officers made arrests in a fourth floor apartment which had access to the roof, where the youths had reentered the building from the rooftop.

In addition to these incidents, on the evening of July 14th approximately 50 townspeople gathered across the street from the residence of an interracial couple, the Becker–Dixons, and their young child for the purpose of verbally assaulting the couple. By the time police arrived there, the townspeople had dispersed. The police determined that the threat to the couple was no longer viable. The Hanover police did not take any further action on behalf of the couple, and no other incident at that residence was alleged.

Finally, on the evening of July 14th as well, two black plaintiffs were arrested in an automobile incident after police officers observed what they characterized as the reckless and threatening maneuvering of an automobile through the crowd of townspeople. The owner of the car, Ms. Chronister, a white female plaintiff who was standing on the street within six feet of arresting Police Officer Boyer, was struck several times by an unidentified townsperson. Police Officer Boyer scolded her for allowing black persons to use her car in Hanover under the volatile circumstances.

At midnight on July 14th, Hanover's Mayor Attlesberger declared a state of emergency and invoked a curfew, which ended all

---

**3.** According to the PSP Report, the youth group arrived between 9 and 10 p.m. that evening armed with "baseball bats, knives, hockey sticks and clubs". A. 72. After the confrontation in the Square subsided, police collected "bats, knives, chains and various other weapons." A. 73.

incidents.[4] Although there is some dispute as to which officials knew "what" prior to the July 13th Hanover Square incident, the district court acknowledged that at least Mayor Attlesberger became aware of the rumored bikers' conspiracy on July 12, 1991, and informed Police Chief Lippy of the rumors that same day. The PSP Report confirms the timing of the Mayor's awareness, and indicates that Police Chief Lippy was apprised of the rumors no later than 4 p.m. on July 13, 1991, hours before the Square incident occurred.

All of the civil rights claimants sued Mayor Attlesberger, Police Chief Lippy and the Borough of Hanover, seeking damages and expunction of criminal records created from their arrests and citations. Only Ms. Chronister sued Police Officer Boyer for a violation of § 1986.

## II.

■ Before deciding whether the evidence suggests a genuine issue of material fact as to 42 U.S.C. § 1986 liability such as to warrant vacatur of the district court's summary judgment order, we must decide first the propriety of the district court's consideration of the PSP Report. The plaintiffs relied virtually exclusively on this report to support the existence of genuine issues of material fact. The plaintiffs did not submit affidavits in opposition to the motion, but did submit the sworn deposition of Pennsylvania State Police Captain Ronald Rostalski properly authenticating the PSP Report. The plaintiffs also submitted excerpts from their own deposition testimony.

■ We are quite satisfied that the district court exercised sound discretion in admitting for consideration the PSP Report, which is indeed unsworn, authored by an investigator who did not have personal knowledge, and which contains opinion based on hearsay. We note that affidavits in support of summary judgment can be opposed by any admissible evidence, including that contained in "the pleadings, depositions, answers to interrogatories, admissions on file,

together with the affidavits, *if any.*" Fed. R.Civ.P. 56(c) (emphasis added). Rule 56(e) further indicates that the adverse parties' response may be in the form of "affidavits *or as otherwise provided* in [Rule 56] ..." (emphasis added). Thus, while Rule 56(e) makes clear that the appellants were required to submit more than mere allegations in their pleadings to oppose the movants' properly supported summary judgment motions, the evidence submitted showing a material factual issue for trial need not have been in the form of an opposing affidavit, as the defendants contend. Hence it was not incumbent upon the plaintiffs under Rule 56 to submit counter-affidavits, albeit such affidavits could have enhanced the strength of their arguments. *See Sound Ship Bldg. Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99–100 (3d Cir.), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514–15, 91 L.Ed.2d 202 (1986) (to survive an adverse motion for summary judgment, party opposing motion "need only present evidence from which a jury might return a verdict in his favor").

■ We note further that Federal Rule of Evidence 803(8)(C) explicitly excepts public records and reports "resulting from an investigation made pursuant to authority granted by law," from exclusion under the hearsay rule, because official reports contain inherent indicia of trustworthiness. Thus, the PSP Report, which was authored by officers charged with a legal duty and authorized to conduct the investigation, is presumed admissible under Rule 803(8)(C), including its opinions, conclusions and recommendations, unless the defendants demonstrate its untrustworthiness. *See Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 161–70, 109 S.Ct. 439, 450, 102 L.Ed.2d 445 (1988) (conclusions and opinions in government reports are generally admissible). Moreover, Rule 803(8) does not on its face require that the one who undertakes the investigation and authors the report be qualified as an expert before the report becomes admissible, as the

---

4. A total of 50 citations were issued: 41 citations to members of the interracial group, 5 to townspeople and 4 others. Thirty-three citations were issued to white persons, 13 to black persons, 1 citation to a black hispanic person and 3 to white hispanic persons.

defendants contend. *Cf.* Fed.R.Evid. 702 (experts with scientific, technical or specialized knowledge must be qualified before testifying). We have held that "[b]efore [an objection to the opinion testifier's expert qualifications] may be recognized, ... the party challenging the validity of an official report admitted under 803(8)(C) must come forward with some evidence which would impugn its trustworthiness." *Melville v. American Home Assur. Co.,* 584 F.2d 1306, 1316 (3d Cir.1978). The appellees have failed to do so.

Despite the defendants' contentions, we are satisfied that the district court's implicit finding that no special bias impeded a fair investigation or entered into the preparation of the PSP Report was not clearly erroneous. Fed.R.Civ.P. 52(a) ("Findings of fact, whether based on oral *or documentary* evidence, shall not be set aside unless clearly erroneous....") (emphasis added); *see also Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The investigating officers and authors of the Report were not and are not now parties to the litigation. Although they did interview persons who are parties to the litigation and incorporated their statements into the PSP Report, the bias of those interviewed does not render the PSP Report itself inherently untrustworthy, and such bias cannot be imputed to the investigating officers. Furthermore, the investigating officers interviewed representatives from all factions involved in the Hanover incidents, and appear thus to have achieved some measure of balance between opposing perspectives. We hold that the district court did not abuse its discretion in admitting the authenticated PSP Report. We turn now to the question of whether the PSP Report has sufficed to raise a material factual issue with regard to an element of the § 1986 claims dismissed by the summary judgment order.

### III.

■ 42 U.S.C. § 1986 provides that:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case....

42 U.S.C.A. § 1986 (West 1981). Thus, § 1986 constitutes an additional safeguard for those rights protected under 42 U.S.C. § 1985, and "transgressions of § 1986 by definition depend on a preexisting violation of § 1985...."[5] *Rogin v. Bensalem Township,* 616 F.2d 680, 696 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981).[6] Additionally, a § 1986 plaintiff must show that: (1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed. *See Perez v. Cucci,* 725 F.Supp. 209, 254 (D.N.J. 1989) (citations omitted), *aff'd,* 898 F.2d 142 (3d Cir.1990); Chester J. Antieau & Gary E.

---

5. In order to maintain a cause of action under § 1986, the plaintiffs must show the existence of a § 1985 conspiracy. Any issue of material fact in a § 1986 action presupposes and relates to a § 1985 conspiracy. Thus, if the elements of the § 1985 conspiracy are missing, a § 1986 cause of action is properly dismissed on summary judgment.

The district court did not base its grants of summary judgment on a holding that the evidence did not support a § 1985 claim against the bikers or the townspeople. We will thus limit our review to the factual and legal questions which grounded the district court's summary judgment disposition of the § 1986 claims, and

will not address any alleged deficiencies which the defendants raise in their brief with regard to the alleged underlying § 1985 conspiracy.

6. *Accord Jews for Jesus, Inc. v. Jewish Community Relations Council, Inc.,* 968 F.2d 286, 292 (2d Cir.1992); *Morast v. Lance,* 807 F.2d 926, 930 (11th Cir.1987); *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 203 (7th Cir.1985); *Bradt v. Smith,* 634 F.2d 796, 801 (5th Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 125, 70 L.Ed.2d 106 (1981); *Landrigan v. City of Warwick,* 628 F.2d 736, 739 n. 1 (1st Cir.1980); *Brawer v. Horowitz,* 535 F.2d 830, 841 (3d Cir.1976).

Bair, *Federal Civil Rights Acts* § 281 (1980 & Supp.1993).

The district court dismissed the § 1986 claims brought against Mayor Attlesberger, Chief Police Lippy, the Hanover Borough and Police Officer Boyer by holding that:

> The critical element here is the requirement that the defendants have actual knowledge of the conspiracy. Plaintiffs rely on the PSP report to establish this knowledge. This report, however, speaks only about "rumors," not definite plans. It does not establish the actual knowledge necessary to support a section 1986 claim. This claim will therefore be rejected.

Memorandum Opinion filed May 6, 1993, at A. 18.

■ The plaintiffs contend that the district court misconstrued § 1986's knowledge requirement to exclude "rumors," and argue that "knowledge" under § 1986 is any information which would tend to give notice to the community that a conspiracy is in the making. The plaintiffs further contend that the PSP Report and their deposition testimony raise a material issue of fact with regard to how much forewarning the Mayor, the Chief of Police, and the Borough had, arguing that they had as much as two weeks' prior knowledge of the bikers' conspiracy. Police Officer Boyer, the plaintiffs argue, had sufficient knowledge of the alleged conspiracy at the time Ms. Chronister was struck by an unidentified person at the scene of the automobile incident on July 14th.

We find the factual question of the exact time when the Mayor and the Chief of Police were apprised of the "rumors" to be irrelevant because the district court determined that both had been apprised of the rumors at least by July 12th, i.e., a full day before the events transpired. According to the PSP Report, which we take to be accurate for purposes of reviewing the summary judgment order,

> [t]he Mayor indicated he was aware of the rumors on Friday (July 12, 1991) and that he advised the Chief of Police of them on the same day. The Chief advised he was not aware of any rumors until Saturday (July 13, 1991) at 4:00 P.M., when he was contacted by the Mayor. The Chief then contacted county control in order to have his 3–11 shift commander contact him to clarify the rumors. An article in the *Evening Sun*, dated July 15, 1991, attributes the Mayor as stating, ". . . he contacted Hanover Police Chief . . . Wednesday, after hearing rumors of a potential riot." There is an obvious difference of opinion relative to who knew what and when. However, it was evident that rumors abounded a considerable time before the actual incident. Notwithstanding the differences of opinion regarding prior knowledge of the incident, there was no action taken by Hanover City officials or the Hanover Police Department to defuse the impending situation either with the bikers, townspeople or the youth group.

PSP Report at p. 2, A. 72. Even assuming that the Chief of Police did not hear the rumors until 4:00 P.M. on July 13th, it is clear that the Mayor and the Chief of Police, and by extension, the Borough, had heard of the rumors prior to the planned impending civil rights violation. Thus, it is clear that, if knowledge of the rumors constitutes "knowledge" under § 1986, then the Mayor, the Chief of Police and the Borough had the requisite forewarning contemplated under that statute.

The nature of conspiracy typically precludes direct evidence or a "blueprint" of the conspiratorial plan, and firsthand knowledge is not required under § 1986. The courts have nevertheless required "actual knowledge." *See, e.g., Hampton v. City of Chicago,* 484 F.2d 602, 610 (7th Cir.1973), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974); *Perez v. Cucci,* 725 F.Supp. 209, 254 (D.N.J.1989), *aff'd,* 898 F.2d 142 (3d Cir.1990). The PSP Report does not indicate that either the Mayor, the Chief of Police, Hanover Borough or Police Officer Boyer had direct prior knowledge of a conspiracy to commit a civil rights violation. Nor does the report indicate that the information circulating prior to the initial incident on July 13th regarding the alleged conspiracy was anything other than in the nature of "rumors."

One indication of a rumor's reliability is the manner in which people respond to the rumor. Plaintiff Jeff Dixon testified at his deposition that he had informed Lippy that some motorcycle gangs were coming into town. According to Dixon, Lippy replied at that time that he had heard the rumor too and not to worry about it. When Attlesberger became aware of the rumor of a race riot, he became concerned enough to advise Lippy, who then apparently placed enough credence in the rumor to authorize holding over two extra police officers on Saturday night and to inform Penn Township Police Department about the rumor.

We believe that the PSP Report and other evidence relevant to the defendants' potential knowledge of the conspiracy is sufficient, for purposes of defending against an adverse summary judgment motion, to submit to the jury the question of whether the defendants' knowledge of rumors that bikers planned to drive the interracial group from Hanover on the evening of July 13th was sufficiently reliable to constitute "actual knowledge" of a § 1985 conspiracy. We note, by way of example of relevant evidence on the record, that plaintiff Lisa Becker, a Hanover resident, testified in her deposition as follows:

Q   Had you heard any rumors about there being possible trouble that weekend in Hanover?

A   Yes.

Q   When did you first hear these rumors?

A   I believe it was Thursday, the day before—well, two days, I guess, before.

Q   And who did you hear them from?

A   Just people like around, like neighbors, people that I've worked with. It was just common knowledge that a lot of people heard it. You know, we all went to the store, you heard people talking in the store, but not really people that I really knew. Well, I mean, people that I worked with I knew but not really.

Q   Were they mostly people your age that year heard this from?

A   No, no, it was a range.

Q   What did you hear what was going to happen?

A   That motorcycle gangs were supposed to come in and run the black people and interracial groups out of town and off the square.

With regard to Police Officer Boyer, the plaintiffs have shown that he was on the scene of the Chronister automobile incident on July 14th. The PSP Report indicates that by 12:07 a.m. Sunday morning the Hanover Police Department made its first mutual aid request for assistance from other police departments. Twenty-seven other municipal police departments responded, including Boyer's Conewago Township Police Department, and by 12:14 a.m. outside police units began arriving on the scene in Hanover. Officer Boyer's precise moment of appearance on the scene is not clear from the record; however, the PSP Report indicates that police officers who were on the scene of the car incident had been standing nearby waiting to transport arrestees from the apartment incident before the police converged on the scene of the car incident in response to the sound of a racing engine, squealing tires and screams. The direct inference is that Officer Boyer may have arrived on the scene in Hanover as early as 12:14 a.m. Sunday morning, but not later than approximately 11 p.m. Sunday evening, the hour of the apartment incident. Not only was he presumably briefed on the circumstances before arriving on the scene, but given the escalating racial situation, a jury could infer from his presence on the scene that he, too, became sufficiently aware of the alleged conspiracy to violate the plaintiffs' civil rights when he allegedly failed to protect Ms. Chronister and told her that the car incident was her fault for bringing blacks into the Hanover area.[7]

---

7.   Contrary to the dissenting opinion, we do not believe that Officer Boyer's alleged inadequate response to the situation involving Ms. Chronister and his alleged inappropriate comments to her regarding the fact that two black men were using her automobile during the car incident demonstrate the element of knowledge in the § 1986 count; rather those facts, if proven, implicate the question of whether Officer Boyer neglected or refused to protect Ms. Chronister. We believe, however, that a jury could reasonably infer from Officer Boyer's apparent early Sunday morning arrival on the scene that he would have been adequately apprised of the cir-

In addition to challenging the district court's disposition of the element of "knowledge," the plaintiffs also contend that the district court erred as a matter of law by requiring more than negligence in a § 1986 cause of action. This is apparently a misreading of the district court's opinion. The district court did indeed require that the plaintiffs demonstrate more than negligence to state a civil rights cause of action under § 1983. *See Davidson v. O'Lone,* 752 F.2d 817, 826 (3d Cir.1984) (en banc) (more than negligence required to sustain a cause of action under § 1983), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

■ The text of § 1986 clearly states that *neglecting or refusing* to prevent a § 1985 conspiracy is actionable. Although discriminatory intent is essential in proving a § 1985(3) conspiracy, "it does not follow that a defendant charged under section 1986 with neglecting to intervene in a section 1985(3) conspiracy must personally share the class-based animus." 3 Joseph G. Cook & John L. Sobieski, Jr., *Civil Rights Actions* ¶ 13.10 (1993). Accordingly, we hold that negligence is sufficient to maintain a § 1986 claim. However, we hold that the district court did not err as a matter of law here because it dismissed the § 1986 claims on the basis that the evidence did not establish actual knowledge or a failure to prevent, not on the basis that the evidence did not establish more than negligence.

■ The plaintiffs separately challenge the district court's judgment against the Becker–Dixons on their § 1986 claim, asserting that the district court erroneously required the element of direct causation. In dismissing this particular § 1986 claim, the district court held that the PSP Report was "far too speculative to allow as proof of causation." Mem.Op. at 24, A. 24. We believe that although the district court's rationale presents some ambiguity, the court's judgment turned on the sufficiency of the PSP Report to raise a material factual issue as to whether the defendants negligently failed to prevent the civil disturbance. We reject the district court's devaluing of the quality of the evidence contained in the PSP Report, and disagree with the district court that the PSP Report was so highly speculative as to warrant the dismissal of the plaintiffs' § 1986 claims on summary judgment. The credibility and weight to be given the PSP Report, which contains sufficient evidence from which a reasonable jury could infer that the defendants failed to prevent the commission of a planned wrong, is a quintessential jury question.[8]

■ We additionally wish to clarify that § 1986 is not directed towards the person who causes a § 1985 violation; rather, it provides a claim "against any person who, knowing that a violation of § 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution." *Rogin,* 616 F.2d at 696. Moreover, § 1986 explicitly imposes liability for damages that a defendant "by reasonable diligence could have prevented." Therefore, a ruling that the Becker–Dixon's claim failed because the crowd, rather than the defendants, perpetrated the wrongful acts would have been incorrect as a matter of law.

We will thus vacate the district court's order granting summary judgment to these defendants.

## IV.

For the foregoing reasons, we will vacate the district court's May 6, 1993, entry of

---

cumstances, perhaps by way of police briefing and his own observations, sufficient to be found knowledgeable of the existence of the alleged § 1985 conspiracy by the time of the occurrence of the acts complained of by Ms. Chronister.

8. The PSP Report indicates that the Hanover Borough officials and the Hanover Police Department failed to provide for proper training of Hanover police personnel to handle civil disobedience incidents and failed to equip police personnel with appropriate riot control equipment. It further found that the Hanover Police Department failed initially to summon sufficient help to handle the incident and failed to utilize existing personnel effectively. The Report also found deficiencies in the police communication network established to coordinate police efforts. According to the PSP Report, a delayed state of emergency curfew, as well as various other cited mishandlings of the racial disturbances, contributed to the escalation of the original incident. *See* PSP Report, A.78–79; 99–100.

summary judgment, certified for appeal on May 7, 1993, and amended on June 4, 1993. We will remand to the district court for proceedings consistent with this opinion.

SEITZ, Circuit Judge, concurring and dissenting.

The majority reverses the order of the district court granting summary judgment to four of the defendants on civil rights claims asserted against them under 42 U.S.C. § 1986.

I agree with the conclusion reached by the majority reversing the judgment for three of the defendants on the § 1986 claims, viz., the Borough of Hanover, its former Mayor and its Chief of Police (collectively "defendants"). I write separately on the disposition of those claims because of a somewhat different analysis of the controlling issue. I dissent from the majority's reversal of the § 1986 claim against the fourth defendant, Carl Boyer, a Conewago Township Police officer.

## BOROUGH OF HANOVER, ITS FORMER MAYOR AND ITS CHIEF OF POLICE

At the threshold, I agree with the majority that the district court did not abuse its discretion under Fed.R.Evid. 803(8)(C), in considering for summary judgment purposes some relevant parts of the Pennsylvania State Police Report of its investigation of the Hanover incident. The majority goes on to conclude:

> We believe that the PSP Report and other evidence relevant to the defendants' potential knowledge of the conspiracy is sufficient, for purposes of defending against an adverse summary judgment motion, to submit to the jury the question of whether the defendants' knowledge of rumors that bikers planned to drive the interracial group from Hanover on the evening of July 13th was sufficiently reliable to constitute "actual knowledge" of a § 1985 conspiracy.

As the majority opinion notes, the State Police Report indicated that the Mayor and the Chief of Police had knowledge of the rumors of the conspiracy at least a day before the rumor came to fruition in Hanover on the date and time contained in the rumor, viz., Saturday, July 13, at 10:00 p.m. Knowledge of the rumors was also stated in the Dixon and Becker depositions.

In my view the issue is whether the combination of these record factors would permit a reasonable finder of fact to infer that the defendants had actual knowledge of the biker conspiracy before it was implemented. The critical and sole factor in resolving that issue here is what constituted "knowledge" as used in § 1986. I believe a useful definition of knowledge is found in § 2.02(7) of the Model Penal Code:

> (7) *Requirement of Knowledge Satisfied by Knowledge of High Probability*. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist.[9]

Indeed, the Model Penal Code definition of knowledge is more meaningful in a civil law context. Because knowledge of a high probability is sufficient for proof of "knowledge" beyond a reasonable doubt, it is more than sufficient for proof of "knowledge" by a preponderance of the evidence.

The pervasive rumors and the other evidence in this record would permit a reasonable jury to conclude that defendants were aware of a high probability of the existence of the conspiracy, at least a day before it was carried out, thus creating an issue for the factfinder as to the existence of defendants' knowledge for § 1986 purposes.

In reaching my conclusion I fully realize that rumor often indicates less than certainty. But here its pervasive character is but part of the totality of circumstances in this record which could permit a reasonable factfinder to determine that these defendants,

---

**9.** The Supreme Court has relied on *Model Penal Code* definitions when construing a familiar companion civil statute from 1871–42 U.S.C. § 1983.

*See Smith v. Wade*, 461 U.S. 30, 41 n. 9, 103 S.Ct. 1625, 1632 n. 9, 75 L.Ed.2d 632 (1983).

given their public positions, had sufficient advance knowledge of the alleged conspiracy.

I therefore join in the judgment reversing the order of the district court granting summary judgment to defendants, the Borough of Hanover, its former Mayor and its Chief of Police. Needless to say, I believe other issues raised by defendants are open for later resolution in the district court.

### DEFENDANT CARL BOYER

The majority also reverses the order of the district court granting summary judgment to Carl Boyer ("Boyer") on the § 1986 claim against him. I would affirm that order on this record.

Defendant, Carl Boyer, is an officer of the Conewago Township Police Department. That Department had a mutual aid agreement with the Borough of Hanover. According to the Pennsylvania State Police Report, the Hanover Chief of Police did not begin requesting assistance from outside police units until 12:07 a.m. Sunday, July 14. That assistance began arriving at 12:14 a.m. The necessary inference is that defendant Boyer did not arrive in Hanover until early Sunday morning. Thus, the disturbances were well underway before Boyer even arrived. Moreover, he did not live or work in the Borough of Hanover. Furthermore, there is no record evidence to suggest that the rumors of the conspiracy reached Boyer's workplace in Conewago Township or his residence in New Oxford, Pennsylvania.

The majority says that:

... given the escalating racial situation, a jury could infer from his presence on the scene that he [Boyer], too, became sufficiently aware of the alleged conspiracy to violate the plaintiffs' civil rights when he allegedly failed to protect Ms. Chronister and told her that the car incident was her fault for bringing blacks into the Hanover area.

I part company with the majority because I believe the facts relied on by my colleagues do not support the knowledge element required by § 1986.

It is first evident that the majority seems to base its position on the premise that Boy-er became aware of the conspiracy when he allegedly failed to protect Ms. Chronister. In my view, the failure to protect Ms. Chronister's civil rights is not evidence of Boyer's knowledge of an existing conspiracy. The same is true of the majority's reliance on what Boyer said to her during the car incident. Thus, in my view, there is no record evidence that creates a jury issue as to Boyer's prior knowledge of any conspiracy. The incident, if anything, raised a possible violation of 42 U.S.C. § 1983.

I would affirm the summary judgment order dismissing the § 1986 claim against Boyer.