**Joann BRANDON, Personal Representative of the Estate of Teena Brandon, Deceased, Plaintiff,**

v.

**John LOTTER, Marvin Nissen, and Charles B. Laux, Richardson County Sheriff, Defendants.**

No. 4:CV94–3423.

United States District Court, D. Nebraska.

Sept. 2, 1997.

---

James Kelley, Michael J. Hansen, Berry, Kelley, Hansen & Burt, Lincoln, NE, for Plaintiff.

Richard L. Boucher, Kim K. Sturzenegger, Boucher Law Firm, Lincoln, NE, for Defendant Charles B. Laux.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This is a tragic case. Teena Brandon (Brandon), a young woman who dressed like a man, was shot by Defendant John Lotter (Lotter) and stabbed by Defendant Marvin Nissen, also known as Tom Nissen (Nissen), in the early morning hours of December 31, 1993. Brandon died. Lotter and Nissen had conspired to kill Brandon to silence her about a prior sexual assault they had perpetrated upon her.

Plaintiff claims that this conspiracy was motivated by the hatred that Nissen and Lotter held for women who dressed like men. The plaintiff further asserts that the conspiracy to kill Brandon was simply an extension of the conspiracy to rape Brandon because she was a female who dressed like a male.

About six days before her death, and on Christmas Day, Brandon reported to Charles B. Laux (Laux), then a county sheriff, that these men had raped her on Christmas Eve. Brandon told Laux that she would testify against the men. Nevertheless, because Brandon was upset with Laux, she refused two requests for follow-up interviews.

Brandon's mother, who is the personal representative of the estate, has sued Laux claiming that he had knowledge of the conspiracy to deny Brandon her civil rights and did nothing to prevent the murder. Laux did not immediately arrest the men and he did not inform Brandon that he was not going to immediately arrest them. Thus, the plaintiff claims that Laux is liable to the plaintiff pursuant to 42 U.S.C. § 1986 (providing a cause of action for neglect to prevent acts done in furtherance of a conspiracy to interfere with civil rights)

Laux has filed a motion for summary judgment. Among other things, he claims that he is entitled to qualified immunity from suit. After carefully reviewing the undisputed material facts, I find and conclude that I must grant summary judgment in favor of Laux on the defense of qualified immunity. A reasonable officer in the shoes of Laux could have believed that Nissen and Lotter were not about to harm Brandon.

## I. Undisputed Material Facts

Drawn from the evidentiary submissions of the parties (filings 27, 29, 30)[1], the undisputed material facts are these:

1. On Christmas Eve in 1993, Brandon, a 21–year–old female who dressed like a male, was at a gathering attended by Lotter, Nissen and others. In an interview given to the sheriff before her murder, Brandon described the gathering this way: "Everybody [was] . . . drinking and partying all night." (Ex. 4, Tr. 12) (transcript of a statement given by Brandon to Laux and a deputy sheriff on December 25, 1993)[2] Brandon, who "didn't feel very good," consumed six

[1]. The plaintiff has designated the unsworn amended complaint as part of her evidentiary submission. (Filing 30.) I note that "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R.Civ.P. 56(e). Contrary to Rule 56(e), the complaint is signed by a lawyer without personal knowledge, the signature on the complaint is not under oath or otherwise verified, and the complaint would not be admissible as evidence. Accordingly, the unsworn complaint was not considered as an affidavit or its equivalent under the Rule.

[2]. References to Exhibits 3 and 4 refer to exhibits contained in Filing 29.

874

beers and a "couple of shots." (*Id.*) Brandon told the sheriff's office that she had stayed overnight at Nissen's home the previous evening. (*Id.* at 11–12.)

2. During the gathering Lotter began "joking around about wanting to have sex with me and I told him he was going to have to get over it." (*Id.* at 12.) They were at Nissen's home. (Ex. 4, Statement at 1) (Brandon's written statement to the Falls City Police Department, December 25, 1993). Sometime later, Lotter and Nissen and Brandon went into a bathroom at Nissen's home, and the men "jerked [her] pants down to find out if [she was] a boy or a girl." (Ex. 4, Tr. 13.) The men then proceeded to beat Brandon while they were in the bathroom. (*Id.* at 13–14.) Earlier that evening Brandon had placed a sock in her underpants, but by the time the men had taken her to the bathroom she had removed it. (*Id.* at 14.) Brandon would "run around once in a while with a sock in [her] pants to make [her] look like a boy." (*Id.* at 14–15.)

3. After the incident in the bathroom that was not witnessed by anyone except the participants, Lotter and Nissen took Brandon to a remote spot, and each man raped her. (*Id.* at 16–23.) Before the rape, the car the three were riding in became stuck. An unknown farmer pulled the car out of the mire. Brandon thought the farmer saw her, but did not think the farmer saw her face. (*Id.* at 4.)

4. After the rape, Nissen again beat Brandon. (Ex. 4, Statement at 3.) Nissen told Brandon to tell anyone who asked why she was bloody that "we were bumper skiing." (*Id.*)[3] At about 5:00 a.m., the three returned to Nissen's home, where they learned from Nissen's wife and Lotter's girlfriend that the police had been looking for Brandon and Nissen. (Ex. 4, Tr. 9.) Earlier, at about 2:00 a.m., Brandon spoke with her sister in the presence of Nissen. (*Id.* at 1.) Because of that conversation, Brandon's sister became concerned for Brandon's welfare and called the police. (*Id.* at 9.)

5. Because Brandon was bloody, Nissen explained to his wife and Lotter's girlfriend

that Brandon "had wiped out." (*Id.*) Brandon suspected that Lotter's girlfriend knew the truth. (*Id.*) Nissen told Brandon that she could not leave the house. (Ex. 4, Statement at 3.) While Nissen, Lotter and the other two women were preparing to sleep, Brandon went into the bathroom ostensibly to take a shower. By opening a window in the bathroom, Brandon escaped through a window. (*Id.*)

6. Brandon then called the police. (*Id.*) She was first interviewed at about noon on Christmas Day by an officer of the Falls City Police Department. (Ex. 4 (Statement).) She gave a three-page written statement to the officer. (*Id.*) Sometime that morning Brandon was also examined by a doctor who took "samples" from her body. (Ex. 4, Tr. 29.)

7. At approximately 3:40 p.m. on Christmas afternoon, Brandon gave a taped interview to a deputy sheriff and Laux. (*Id.* at 10.)

8. During a part of the interview, the deputy sheriff expressed surprise when Brandon stated, "I never had sex before." (*Id.* at 6.) The deputy stated, "[N]ow Teena, you are saying that you were a virgin until [then]? Do you remember talking to me when you were in jail here and you told me that you were not a virgin?" (*Id.* at 7.) Brandon denied that she had made such a statement. (*Id.*)

9. Laux questioned Brandon bluntly and closely about what had happened (*id.* at 10–29), including asking Brandon about perceived inconsistencies in her story. (*Id.* at 15.) He also asked her why "do you run around with girls instead of guys being you are girl yourself" and why "do you make girls think you are a guy?" (*Id.* at 22.) This discussion was preceded by Brandon telling Laux that before she went into the bathroom with Nissen and Lotter, she had a sock in her underpants, but she had removed it by the time the three went into the bathroom. (*Id.* at 14–15.) Brandon had initially neglected to tell Laux about the sock. (*Id.* at 14–15.) Brandon did not "see it as important."

3. Brandon explained that "bumper skiing" involved the use of a car to pull a person, presumably down an icy road. (Ex. 3 at 9.)

(*Id.* at 15.) This prompted Laux to tell Brandon: "It's all important when we are doing an investigation. We ask you to start at the beginning and you skipped half of it, now if we don't know all [of] i[t] we are kind of in the middle of daylight and dark." (*Id.*)

10. Laux told Brandon that he knew "this is a very difficult situation to talk to you about," that he had to ask "rough" questions "so we can get the bare facts out now when we are going to present it to the County Attorney," and "I'm not trying to make it rough on you, but I have to have the information that we need and the only way [to obtain] that is asking some very personal questions." (*Id.* at 24.)

11. Brandon told Laux that she would testify against Nissen and Lotter. (*Id.*) Laux concluded the interview by telling Brandon that "if we don't have your cooperation we are not going to have any case in Court either." (*Id.*) Brandon responded that she understood. (*Id.*)

12. After Brandon left the interview, she was upset with Laux. (Ex. 3 ¶¶ § –9.) Brandon told[4] her mother that Laux had been "rude," "mean," he "just did not seem to give a damn about the rape" and that Laux asked her "sexual questions unrelated to the rape." (*Id.* at ¶¶ 5–8.) As a result, Brandon told her mother that "she did not want to go back to Defendant Laux's office because she thought Defendant Laux would continue to be mean and verbally abuse her in the manner he did during his interview with her on December 25, 1993." (*Id.* at ¶ 6.)

13. After the interview with Brandon on Christmas Day, Laux made two appointments with Brandon to obtain further information from her. (Ex. 2 ¶ 9.)[5] Brandon failed to keep either appointment. (*Id.*) Nevertheless, by December 30, 1993, Laux believed he had "sufficient information" to apply for a warrant. (*Id.*) Based upon Laux's 22 years of experience as a law enforcement officer, Laux believed that it was necessary to develop "circumstantial evidence of Lotter and Nissen's motive, opportunity and means

to commit the crime and evidence showing lack of consent or mistake prior to arresting Lotter and Nissen." (*Id.* ¶¶ 12–13.) Laux was particularly concerned about the issue of consent and the absence of a witness. (*Id.*) He feared that a premature arrest would harm prosecution, possibly endanger Brandon or provide an opportunity for Lotter and Nissen to flee. (*Id.* ¶ 13.) Brandon never told the city police in her statement, nor did she tell Laux, that she believed she was in imminent peril. (*Id.* Ex. 4) (written statement and transcript of interview).

14. Immediately after her escape from them, Lotter and Nissen began talking among themselves about killing Brandon. (Ex. 1 at 44) (testimony of Nissen given during the murder trial of Lotter). These discussions always took place in private with no third parties present. (*Id.* at 44, 51.) Lotter and Nissen wanted to kill Brandon because "a dead witness couldn't testify." (*Id.* at 43.)

15. On December 28, 1993, a Falls City police officer interviewed both Lotter and Nissen, and at that point the men knew "for certain" that they were "in trouble." (*Id.* at 53.) They began to "step up" their discussion about "what do about Brandon." (*Id.*) Like the earlier conversations, these discussions were strictly between Lotter and Nissen. (*Id.* at 54–55.)

16. Although the men had earlier talked about their plan and had made efforts to locate Brandon, it was "not [un]til" the "evening of [December] 30th" that "there [was] any specific plan advanced [by Lotter or Nissen] with regard to what to do." (*Id.* at 50.) Before December 30th, the men were "drunk or drinking all the time." (*Id.* at 51.) On December 30 the men discussed among themselves "a whole bunch of different ways" to kill her, and again no one else was present. (*Id.* at 55, 61–62.) By that evening, both men were drunk again. (*Id.* at 59.)

17. Early in the morning of December 31, 1993, Lotter and Nissen learned from Linda Gutierres, a friend's mother, that Brandon

---

4. I assume, without deciding, that the statements made by Brandon to her mother would be admissible at trial.

5. References to Exhibits 1 and 2 refer to exhibits contained in Filing 27.

**876**

was at the home of Lisa Lambert. (*Id.* at 67–70.) After driving "past the deputy's home" to make certain he was not on patrol (*id.* at 5), the men went on to Lambert's home near the small town of Humboldt. (*Id.*)

18. Upon arriving at the home, the men kicked the door to the Lambert house and entered it. (*Id.* at 10–11.) The men found Lambert in bed, with Brandon hiding near the bed. (*Id.* at 12–14.) Lotter shot Brandon, and Nissen stabbed her. (*Id.* at 16–17.) Lotter also shot Lambert. (*Id.* at 25.) Lotter then shot Phil Devine who was found in another part of the home. (*Id.* at 27–28.) All three people died.

## II. Discussion

Before directly addressing Laux's argument about qualified immunity, understanding one critical aspect of what the plaintiff would be obligated to prove at trial is necessary. After that, it is possible intelligently to discuss the qualified immunity argument.

### A.

The federal civil rights law applicable to the plaintiff's claim against Laux provides in pertinent part that:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable. . . .
>
> 42 U.S.C. § 1986.

To succeed at trial, the plaintiff would be obligated to prove four essential elements. I would require that the plaintiff prove: "(1) the defendant had actual knowledge of a § 1985 [6] conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Clark v. Clabaugh,* 20 F.3d 1290, 1295 (3rd Cir.1994).

As we will see, one element of the plaintiff's section 1986 claim is very important to the qualified immunity analysis here, and that element is "knowledge." "Knowledge of the acts is a statutory prerequisite to suit under 42 U.S.C. § 1986." *Buck v. Board of Elections of City of New York,* 536 F.2d 522, § 24 (2nd Cir.1976) (dismissing suit against chancellor of school system and others that alleged school board rigged election and chancellor neglected to stop the abuse). *See also* 3 Joseph G. Cook and John L. Sobieski, *Civil Rights Actions* ¶ 13.10 at 13–51 & n. 5 (1997) ("Knowledge of the conspiracy is an essential element.") (collecting cases).

Furthermore, the statute requires that a specific type of knowledge exist in the minds of a defendant before liability can attach. The defendant must know that the *"wrongs* conspired to be done, and mentioned in section 1985 . . ., *are about to be committed."* 42 U.S.C. § 1986 (emphasis added).

Moreover, as Mr. Justice Stevens made clear when he was a circuit judge, "Liability under § 1986 . . . is dependent on proof of *actual knowledge* by a defendant of the wrongful conduct. . . ." *Hampton v. City of Chicago,* 484 F.2d 602, 610 (7th Cir.1973) (mayor and police commissioner were not liable under section 1986 for the consequences of an alleged conspiracy by police officers to kill two members of the Black Panthers and to punish seven other members for exercising their First Amendment rights because there was no claim that the mayor and police commissioner had actual knowledge of the conspiracy), *cert. denied,* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974) (emphasis added) Thus, before a defendant can be liable under section 1986, he or she must *actually know* that the wrongs

---

6. In this case, the plaintiff alleges that Lotter and Nissen entered into a section 1985(2) conspiracy for the purpose of hindering justice with intent to deny Brandon equal protection of the laws, and also a section 1985(3) conspiracy for the purpose of depriving Brandon of the equal protection of the law. (Filing 10.) In particular, the plaintiff argues that the sexual assault and killing of Brandon were done in furtherance of a conspiracy to deny Brandon her First, Fifth and Fourteenth Amendment rights because she was a woman who dressed like a man. (*Id.* ¶¶ VII and XIX.)

that are the objects of the section 1985 conspiracy *are about to be committed.*

## B.

With these principles in mind, I now turn to Laux's qualified immunity argument. This discussion requires an elaboration of the principles of the qualified immunity defense in a motion for summary judgment, and then application of those principles to the facts.

### 1.

■ Government officials who are sued for damages in their individual capacities under the civil rights laws for their performance of discretionary functions are entitled to qualified immunity from suit if they prove that their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). When summary judgment is sought on qualified immunity, there are two parts to the analysis, assuming, as here, that the material facts are not in dispute.

First, one decides whether the law was "clearly established." "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). The specific act in question need not previously have been declared unlawful, but "in the light of pre-existing law the unlawfulness must be apparent." *Id.*

Second, assuming the law is clearly established and the facts are undisputed, the "relevant question" then "is the objective (albeit fact-specific) question" of "whether a reasonable [defendant] could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the [defendant] possessed." *Id.* at 641, 107 S.Ct. at 3040. The defendant's subjective beliefs about the challenged conduct "are irrelevant." *Id.* I must grant summary judgment on qualified immunity grounds " 'if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact ... violated clearly estab-

lished law.' " *Johnson v. Boreani,* 946 F.2d 67, 70 (8th Cir.1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985))

### 2.

■ Initially, I assume, without deciding, that the law was "clearly established" when Laux acted or failed to act. In other words, I assume that the plaintiff has stated a claim under section 1986 against Laux, and that the "contours of the right [were] sufficiently clear that a reasonable official would understand that what [Laux was alleged to be] doing violate[d] that right." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039.

This assumption having been made, I must next decide the second qualified immunity question. I must decide whether the undisputed material facts, viewed in a light most favorable to the plaintiff, warrant the conclusion that "a reasonable [defendant] could have believed [the challenged conduct] to be lawful, in light of clearly established law and the information the [defendant] possessed." *Id.* at 641, 107 S.Ct. at 3040.

Viewing the undisputed material facts in the light most favorable to the plaintiff, I find and conclude that a reasonable person (including a reasonable law enforcement officer) in Laux's position would not have had "actual knowledge" that the "wrongs conspired to be done, and mentioned in section 1985 ..., [were] about to be committed." Therefore, a reasonable person could have believed, in light of clearly established law and the information Laux possessed, that the failure to immediately arrest the men or warn Brandon that the arrest would be delayed did not violate clearly established law. After all, the decision about when to arrest a criminal suspect is the quintessential discretionary judgment. *Ricketts v. City of Columbia,* 36 F.3d 775, 780 (8th Cir.1994) (where the death of a person followed repeated incidents of domestic violence that were reported to the police, the Court of Appeals stated: "Holding that an officer's failure to arrest for one incident of harassment *causes* a subsequent incident of harassment or violence would essentially take away the officer's discretion to determine when to arrest—a fundamental part of our criminal system.") (emphasis in original)

(citation omitted), *cert. denied,* 514 U.S. 1103, 115 S.Ct. 1838, 131 L.Ed.2d 757 (1995). Accordingly, Laux is entitled to qualified immunity.

To be precise, a reasonable law enforcement officer could have believed that Lotter and Nissen were not about to harm Brandon, and thus a reasonable officer could have believed that inaction was warranted. I am persuaded on this point for the following five reasons:

1. Neither in the statement given to the city police nor during her interview with the sheriff's office did Brandon express a concern that she was in imminent peril. If Brandon did not express fear that she was in imminent danger, then a reasonable sheriff could believe that no such threat existed.

2. Because Brandon failed to keep two appointments with Laux, a reasonable sheriff could assume that Brandon's lack of cooperation showed the absence of imminent peril.

3. Lotter and Nissen kept their plans secret.

4. Before killing Brandon, Lotter and Nissen made sure a nearby law enforcement officer was at home and not likely to interfere with their murderous scheme.

5. Although Brandon contacted the city police and the city police were also investigating the case, as shown by the interviews of Lotter and Nissen on December 28, there is no evidence that the city police believed Brandon was in imminent peril.

In her brief the plaintiff tries to overcome Laux's evident lack of knowledge by arguing that: "The transcription of the interview between Teena Brandon and Defendant Laux after Ms. Brandon's rape, patently shows that Defendant Laux violated clearly the established law in both the way he conducted himself in the interview and his actions following the interview in failing to arrest Lotter and Nissen." (Br. Opp'n Def.'s Mot. Summ. J. at 7.) Specifically, the plaintiff states that "Laux's words toward Teena Brandon in the interview clearly show the same invidiously discriminatory animus toward her as exhibited by that of Lotter and Nissen. (Exhibit 4, Page 14, 15.)" (*Id.*)

The plaintiff's argument does not persuade me. The evidence, including the cited references to the transcript, wholly fails to create a fact issue about knowledge of impending peril to Brandon. No doubt one could (and perhaps should) criticize Laux for his crude interview technique. However, there is nothing in the questions propounded to Brandon, the answers that she gave to the questions, or the comments made by Laux that would suggest that a reasonable investigator could not have believed that Brandon was safe.

In particular, Laux's inquiry into Brandon's behavior of dressing like a man was especially relevant to the investigation. Surely the motives of Lotter and Nissen for the rape—although depraved—were appropriate grounds for inquiry by Laux. More to the point, nothing that Brandon or Laux said while discussing this topic suggested that Brandon or Laux believed she was in danger. In short, while Laux may have been insensitive, a reasonable investigator could have believed that Lotter and Nissen were not about to harm Brandon.

In summary, a reasonable law enforcement officer in Laux's shoes could have concluded that Brandon was not in danger. This being the case, Laux did not violate clearly established law when he failed to immediately arrest Lotter and Nissen or take some other related action, and he is entitled to qualified immunity as a result.

IT IS ORDERED that:

1. Laux's motion for summary judgment (filing 26) is granted based on qualified immunity, and Laux is granted immunity from the plaintiff's suit for damages.

2. There being no just reason for delay, judgment will be entered in favor of Laux and against the plaintiff pursuant to Federal Rule of Civil Procedure 54(b).