Hawa Abdi **JAMA, et al., Plaintiffs,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, et al., Defendants.**

**Samson Brown, et al., Plaintiff, on behalf of themselves and all others similarly situated,**

v.

**Esmor Correctional Services, Inc., et al., Defendants.**

Civ. Nos. 97–3093(DRD), 98–1282(DRD).

United States District Court, D. New Jersey.

Sept. 9, 2004.

As Amended Sept. 28, 2004.

Frank Askin, Esq., Penny M. Venetis, Esq., Rutgers Constitutional Litigation Clinic, Rutgers Law School, Newark, NJ, Sean Mack, Esq., Debevoise & Plimpton, New York City, for Plaintiffs, Hawa Abdi Jama et al.

Bruce J. Ressler, Esq., Ellen R. Werther, Esq., Ressler & Ressler, New York City, for Plaintiffs, Samson Brown et al.

Steven D. Weinstein, Esq., J. Llewellyn Mathews, Esq., Blank Rome LLP, Cherry Hill, NJ, Larry S. Reich, Esq., Blank Rome LLP, New York City, Frank R. Volpe, Esq., Ryan D. Nelson, Esq., Sidley Austin Brown & Wood, LLP, Washington, DC, for Defendants Esmor Correctional Services, Inc.; James F. Slattery; John Lima; Richard Staley; Aaron Speisman.

Edward R. Murphy. Esq., Elizabeth Dalberth, Esq., Murphy and O'Connor, Cherry Hill, NJ, Marvin C. Moos, Ebanks, Smith & Carlson, L.L.P., Houston, TX, for Defendants Michael D. Rozos, Earline Boyer, Alan Friess, Norman Uzzle, and David McLean.

E. Carr Cornog, Esq., Rotolo ♦ Midlige, Lebanon, NJ, for Defendants Willie O. Hunter and Michael Jackson.

Gloria Cherry, Esq., Braff, Harris & Sukoneck, Livingston, NJ, for Defendants Tommie Lee Brown, Robert Snead, Okay Nkenke, Phillip Johnson, and Kevin Brodie.

Jeffrey M. Kadish, Esq., Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, NJ, for Defendants Dorian Hunter, Michael Melendez, James Stratford, and Corey Stratford.

Gerald D. Siegel, Esq., Vidya Prasad, Esq., Siegel & Siegel, P.C., Plainsboro, NJ, for Defendant Irving Brown.

John B. Livelli, Esq., Robinson & Livelli, Newark, NJ, for Defendant Willard Stovall.

## OPINION

DEBEVOISE, Senior District Judge.

Pending before the Court are numerous defense motions for summary judgment and for related relief in two actions instituted by undocumented aliens who were detained at a facility that the Immigration and Naturalization Service ("INS") maintained in Elizabeth, New Jersey pending a determination of their asylum status. Esmor Correctional Services, Inc. (now Correctional Services Corporation) ("Esmor") operated the facility under contract with the INS.

The first action, *Brown v. Esmor Correctional Services, Inc., et al.,* Civil No. 98–1282, is a class action that was filed in the Supreme Court of the State of New York on or about March 6, 1996. Defendants in the case removed it to the United States District Court for the Southern District of New York on April 10, 1996 based upon diversity and federal question jurisdiction. On March 11, 1998 that court transferred the action to this Court.

The second action is *Jama v. United States Immigration and Natural Service, et al.,* Civil Action No. 97–3093, filed in this Court on September 23, 1997. In a first amended complaint twenty individual Plaintiffs named as Defendants the INS, Esmor, forty-four named individuals and John and Jane Does 1–50.[1]

The following opinion directly addresses Defendant Esmor's motion for summary judgment in *Brown.* It also addresses some but not all of the pending motions in *Jama,* including defense motions to dismiss for failure to prosecute and a motion by a group of professors of international law to file a brief as amicus curiae. Because, as the following discussions detail, *Jama* is a far more complicated case than *Brown,* the summary judgment motions by

1. For a time a related individual action was pending, *Joaquin DaSilva v. Esmor Correctional Services Incorporated, et al.,* Civil Action No. 96–3755 ("the *DaSilva* Action"), but it was dismissed without prejudice and the plaintiffs became members of the *Brown* action class.

Defendants in *Jama* will be addressed at a later date.

## BACKGROUND

### A. Procedural Background

The Plaintiffs in the *Brown* and *Jama* actions are foreign nationals and refugees who sought political asylum in the United States. They were taken into custody by the INS and incarcerated at the facility that Esmor operated in Elizabeth (the "Facility"). Esmor manages and operates for-profit corrections and detention facilities for federal, state and local corrections and other agencies.

The Facility was in operation from approximately August 1994 to July 1995. On June 18, 1995 the detainees rioted, and the Facility was shut down shortly thereafter. The detainees were transferred elsewhere in the United States or were deported.

In both the *Brown* and *Jama* actions the Plaintiffs allege that while they were detainees at the Facility they were tortured, beaten, harassed, and otherwise mistreated by Esmor guards, and that they were subjected to abysmal living conditions including inadequate sanitation, exercise, and medical treatment. A summary of the legal claims and of the procedural history of each case follows.

### 1. The *Brown* Action

The *Brown* action as it now stands is a model of simplicity. It names a number of class Plaintiffs (reduced in number since the original complaint was filed) who sue on behalf of themselves and all others similarly situated. On April 24, 1998 the Court certified a class—namely, all detainees who were incarcerated at the Facility during its operation from August 1994 to July 1995.

In the *Brown* action Plaintiffs named as defendants not only Esmor but also certain affiliated corporations and two of Esmor's officers, James Slattery and Aaron Speisman. The Amended Complaint filed June 19, 1998 alleged seven causes of action: (i) Esmor negligently failed to properly screen, hire, train and otherwise manage its employees; (ii) Esmor knowingly, recklessly and intentionally failed to properly screen, hire, train and otherwise manage its employees; (iii) Esmor's employees, acting within the scope of their employment, negligently caused Plaintiffs' injuries, rendering Esmor liable; (iv) Esmor's employees, acting within the scope of their employment, maliciously, recklessly and intentionally caused Plaintiffs' injuries, rendering Esmor liable; (v) Plaintiffs are the intended beneficiaries of the contract between the INS and Esmor, and Plaintiffs' injuries were caused by Esmor's breach of that contract; (vi) all the Defendants, acting under color of federal law, violated Plaintiffs' rights protected by the First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United States Constitution, 8 U.S.C. § 1362, and/or other federal law; and vii) Defendants Slattery and Speisman had knowledge of, supervised and participated in and acquiesced in the wrongful acts and are personally liable to Plaintiffs.

Discovery proceeded. By order dated October 27, 2003 the claims against all the corporate entities other than Esmor, the claims against James Slattery and Aaron Spiesman as well as Count 7 were dismissed with prejudice. Thus Esmor is the sole remaining Defendant in the *Brown* action.

In view of the Supreme Court decision in *Correctional Services Corporation v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), which was decided after the *Brown* action was commenced, the Plaintiff class has acknowledged that its claims against Esmor arising under the

United States Constitution are no longer viable. Further, the Plaintiff class has determined on the basis of developments in the law since commencement of the action to withdraw the claims based upon 8 U.S.C. § 1362.

As a result of these developments four claims remain in the *Brown* action: (i) a claim based on Esmor's knowing, reckless, and intentional failure to properly screen, hire, train, and supervise its employees; (ii) a claim based on Esmor's negligent hiring, training and supervision of the Esmor guards; (iii) a claim of Esmor's respondeat superior liability for the negligent and/or intentional acts of the Esmor guards whom it employed; and (iv) the claim of the Plaintiff class members against Esmor as third-party beneficiaries of the Esmor contract with the INS for damages suffered as a result of Esmor's breach of that contract. These are all state law claims.

### 2. The *Jama* Action

The *Jama* action presents a very different picture; it is the ultimate in complexity. The Complaint was filed in this Court on September 23, 1997.

The Defendants fall into various categories: (i) Esmor, (ii) Esmor officers ("Esmor Officers"), (iii) Esmor Guards ("Esmor Guards"), (iv) the INS and (v) INS officials ("INS Officials").

In the *Jama* action Plaintiffs asserted numerous claims against each of these categories of defendants. Counts 68–84 accused the Esmor Guards of violations of the First, Fifth, and Thirteenth Amendments to the United States Constitution, numerous provisions of the New Jersey Constitution, the International Covenant on Civil and Political Rights ("ICCPR"), customary international law, the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), the Religious Freedom Resto-

ration Act, 42 U.S.C. §§ 2000 bb, et seq. ("RFRA"), the Fair Labor Standards Act, and New Jersey law. With the exception of counts 80 (failure to compensate employees under the Fair Labor Standards Act) and 83 (failure to ensure the safety of Plaintiffs' confiscated property under New Jersey law), all these counts asserted active violations of detainees' rights by the guards themselves.

In counts 50–67 the *Jama* Plaintiffs made corresponding allegations against the Esmor Officers—predicating the officers' liability for the actions of the guards on "failing to curb" the pattern of abuse, or "deliberate indifference," and, in the case of the New Jersey tort law claims, on theories of respondeat superior and of negligent hiring, training, and supervision.

The claims against Esmor as a corporation (counts 31–49) were equivalent to those against the Esmor Officers, with the addition of a breach of contract claim (count 33) alleging that the *Jama* Plaintiffs were third-party beneficiaries of Esmor's contract with the INS and that they were harmed by Esmor's breach of that contract. The language of count 37 was a little different from that of count 55: in the former the corporation was accused simply of failing to take appropriate steps to ensure that property was protected; in the latter the officers were accused of acting with deliberate indifference to the Plaintiffs' being deprived of property.

In counts 13–30 the *Jama* Plaintiffs invoked the same rights against the INS Officials as they did against the Esmor Officers—advancing theories of liability based on omissions—"failing to curb" and "deliberate indifference." In their claims under New Jersey law, the *Jama* Plaintiffs alleged negligent hiring and supervision, the breach of a duty to ensure the safety of Plaintiffs' confiscated property, and the

breach of a duty to ensure Plaintiffs' safety from abuse.

Finally, in counts 1–12 the *Jama* Plaintiffs asserted claims against the INS— invoking New Jersey tort and contract law, the ICCPR, customary international law, the RFRA, and the ATCA. In all counts other than those invoking New Jersey law, INS liability was predicated upon its failure to curb abuses at the Esmor facility. In alleging violation of New Jersey tort law, the *Jama* Plaintiffs advanced theories of respondeat superior, of negligent hiring and supervision, and of failure to ensure that Plaintiffs could recover their confiscated property.

In 1998 the INS moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) or, in the alternative, for summary judgment. INS Officials Alan Freiss, Norman Uzzle, Michael Rozos, Earline Boyer and David McLean joined the INS's motion. The United States was substituted as a defendant as to the claims against the INS Officials based on New Jersey state law and the New Jersey constitution. The INS Officials urged that all of the remaining claims should be dismissed except those based upon the First and Fifth Amendments of the United States Constitution.

Esmor, the Esmor Officers and the Esmor Guards (collectively, "the Esmor Defendants") joined in the motion and argued for dismissal of several of the claims asserted against them: (i) those founded upon the Fair Labor Standards Act,(ii) the Thirteenth Amendment claims, (iii) claims arising under the New Jersey Constitution, (iv) the RFRA claims, (v) the ATCA claims, and (vi) claims arising under the ICCPR and customary international law.

The Court issued its opinion addressing the motion on October 1, 1998 ("the 1998 Opinion"), *Jama v. U.S. Immigration and Naturalization Service*, 22 F.Supp.2d 353 (D.N.J.1998). The rulings in that opinion bear upon the pending motions for summary judgment, although intervening developments in the law affect some of those rulings.

The opinion dealt with the claims brought under international law and the effect of the ATCA, 28 U.S.C. § 1350, which gives district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The opinion noted that for a treaty to confer rights enforceable by private parties it must be self-executing, that is, it must require no legislation to make it operative. The opinion further noted that none of the treaties or other international instruments upon which the *Jama* Plaintiffs rely (including, for example, the ICCPR)) are self-executing or have implementing domestic legislation, and they do not per se provide a basis for suit under the ATCA. Rather, the *Jama* Plaintiffs rely upon them to establish what constitutes the current "law of nations," or international law, that may be sued upon under the ATCA. The opinion held that international law was available to Plaintiffs notwithstanding the fact that Plaintiffs had available to them domestic law remedies:

> For the purposes of the present motions, the allegations of the complaint must be accepted as true and all reasonable inferences favorable to plaintiffs must be drawn from them. When this is done, it is evident that the totality of the treatment to which plaintiffs were subjected violated customary international law as it is now established.

> . . . . .

> The mental and physical abuses which are alleged to have been inflicted upon plaintiffs violate the international human rights norm of the right to be free from

cruel, unhuman and degrading treatment. The ATCA confers federal subject matter jurisdiction when i) an alien sues ii) for a tort iii) committed in violation of the law of nations (i.e., international law), *Kadic,* 70 F.3d at 238. The complaint sufficiently alleges all three jurisdictional requirements.

22 F.Supp.2d at 363.

The opinion also held that the availability of other remedies did not bar on ATCA action:

> Contrary to defendants' argument, there is no absolute preclusion of international law claims by the availability of domestic remedies for the same alleged harm.
>
> .     .     .     .     .
>
> Perhaps if there were domestic law in conflict with the norms of international law, domestic law should prevail. That is not the case here where domestic law is consistent with international norms. There is nothing in the ATCA which limits its application to situations where there is no relief available under domestic law. There is no reason why plaintiffs cannot seek relief on alternative grounds.

22 F.Supp.2d at 364

As to the INS, the 1998 Opinion held that [t]he ATCA, in providing jurisdiction and a right of action under the law of nations, does nothing to displace sovereign immunity, and plaintiffs' claims against the INS based on the ATCA must be dismissed." 22 F.Supp.2d at 365.

As to the INS Officials, the 1998 Opinion held that, because they were being sued in their individual capacities, they are not entitled to sovereign immunity and that the viability of the *Jama* Plaintiffs' ATCA claims against them had best be decided in

the context of a motion for summary judgment.

Similarly Esmor's, the Esmor Officers' and the Esmor Guards' motions to dismiss were denied. The 1998 Opinion held that the Esmor Defendants "were performing governmental services. Thus they were state actors and it is unnecessary to address the question raised in *Kadic,* namely the extent to which non-state actors can be sued under the ATCA." 22 F.Supp.2d at 365–66.

The ATCA rulings with respect to the INS Officials were applicable to the ATCA claims against the Esmor defendants and required that their motions to dismiss be denied.[2]

It is unnecessary to set forth the rationale for the remaining conclusions recited in the 1998 Opinion. A summary of the rulings is set forth the opinion's conclusion:

> The INS motion to dismiss i) all claims brought against it under ATCA or otherwise based upon customary international law, ii) claims brought against it under the FTCA; iii) claims brought against it arising out of the New Jersey Constitution and iv) claims against it deriving from the contract between Esmor and INS will be granted. The INS motion to dismiss claims arising under RFRA will be denied without prejudice to renewal of the motion.
>
> The First Amended Complaint in this action will be amended to name the United States the defendant on plaintiffs' FTCA claims, and the United States shall be deemed to have moved to dismiss plaintiffs' FTCA claims. The motion of the United States to dismiss the FTCA claims will be granted except with respect to the property claims of

**2.** The subsequent Supreme Court opinion in *Malesko* requires that at least as to Esmor these rulings be revisited on the present summary judgment motions.

plaintiffs who submitted administrative property loss claims setting forth the amounts or estimated amounts of their property losses.[3]

The motion of the INS Officials to dismiss i) claims brought against them under ATCA based upon customary international law, ii) claims brought against them arising under RFRA, iii) claims brought against them arising under the Thirteenth Amendment of the United States Constitution and iv) claims brought against them arising under FLSA will be denied without prejudice to renewal of the motion after discovery has been substantially completed. The motion of the INS Officials to dismiss claims brought against them under New Jersey tort and constitutional law is granted.

The motion of the Esmor defendants to dismiss i) claims brought against them under ATCA based upon customary international law, ii) claims brought against them arising under RFRA, iii) claims brought against them arising under the Thirteenth Amendment of the United States Constitution, and iv) claims brought against them arising under FLSA will be denied without prejudice to renewal of the motion after discovery has been substantially completed.[4]

22 F.Supp.2d at 372

On October 30, 2001 the United States and the INS settled the *Jama* Plaintiffs' claims. The settlement agreement provides:

1. In this Settlement Agreement, plaintiffs and the government defendants settle any and all claims filed against the INS and/or the United States, including those stated in the first amended complaint filed on September 23, 1997, in *Jama, et al. v. INS, et al.*, 22 F.Supp.2d 353 (D.N.J.1998) (the "lawsuit"), alleging, *inter alia*, tort liability for damage to property and for emotional damages, violations of United States obligations under various international treaties, and violations of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb.

The *Jama* Plaintiffs contend that this agreement simply settled their RFRA claims against the United States and the property loss claims of five of these Plaintiffs against the United States and did not settle their multiple claims against the INS Officials. That is an issue that remains to be resolved on the motion of the INS Officials for summary judgment.

At a very late date in the proceedings there arose the question whether the *Jama* Plaintiffs had effectively opted out of the *Brown* action and whether they should be precluded from proceeding independently. By reason of the extraordinary difficulties that counsel for the *Jama* Plaintiffs had encountered communicating with their clients, they had not complied with the literal provisions of the order governing requests for exclusion. The magistrate judges handling this case and this Court entered several orders dealing with this problem. It is unnecessary to recount the details of the proceedings. Suffice it to say, by a June 10, 2003 order[5]

**3.** Sufficient property claims were submitted by *Jama* Plaintiffs Addai, Anang, Awotwe, Badjoko, Baker, Crespo, Jama, Jeyakumar, Kenneh, Manoharan, Manu, Raji, and perhaps Serwaa.

**4.** In light of the Court of Appeals decision in *Tourscher v. McCullough*, 184 F.3d 236 (3d Cir.1999) the *Jama* Plaintiffs voluntarily agree to dismiss their FLSA claims against all defendants.

**5.** The Esmor defendants' appealed the Court's order validating the opt out notices of nine

the Court ruled that the following persons who were originally named as Plaintiffs in the *Jama* action had successfully opted out of the *Brown* action and continued as individual Plaintiffs in the *Jama* action:

Hawa Abdi Jama

Anantharajah Jeyakumar

Abu Bakar

Cecilia Kou Jeffrey

Abraham Kenneth [Kenneh]

Dennis Raji

Agatha Serwaa

Shamimu Nanteza

Sarah Tetteh Yower

The other persons named as Plaintiffs in the *Jama* action have failed to opt out effectively and consequently are members of the *Brown* action class. They will be dismissed from the *Jama* action without prejudice to their right to pursue their class action remedies.[6]

As a result of these developments in the *Jama* action only the nine individual Plaintiffs listed above remain in the case.[7]

There are four categories of defendants: (i) the INS Officials, (ii) Esmor, (iii) Esmor Officials and (iv) the Esmor Guards.

The INS Officials who are defendants and subject to the jurisdiction of the Court are Michael Roza, Earline Boyer, Alan Friess and Norman Uzzle.[8] The claims against these Defendants surviving the 1998 Opinion were (i) a Fifth Amendment due process claim based on the alleged failure to curb the pattern of abuse at the facility, (ii) alleged violations of customary international law as informed by various treaties and conventions; (iii) a First Amendment claim that these defendants acted with deliberate indifference towards the *Jama* Plaintiffs' attempts to exercise their religions, (iv) violation of RFRA, 42 U.S.C. § 2000 b, et seq., by substantially burdening these Plaintiffs' right to free exercise of their religions, (v) violation of the Thirteenth Amendment by acting with deliberate indifference towards the *Jama* Plaintiffs engaging in forced, unpaid labor, (vi) alleged violation of FLSA[9] and (vii) alleged violation of the ATCA.

The claims against Esmor are as follows[10]: (i) a claim based on the ATCA on account of alleged violations of customary international law; (ii) alleged violation of RFRA; (iii) New Jersey state law claims of failing to protect Plaintiffs' property, negligent hiring, training, supervision and retention of its employees, and intentional infliction of emotional distress; (iv) a claim for breaches of the contract between the

---

*Jama* action Plaintiffs. The appeal is still pending before the Court of Appeals.

**6.** None of the plaintiffs in the *DaSilva* Action opted out of the *Brown* action effectively. The *DaSilva* complaint has been dismissed without prejudice to the right of the *DaSilva* plaintiffs to pursue their class action remedies.

**7.** The *Jama* Plaintiffs have agreed to dismiss their claims against INS official David McLean.

**8.** Twenty Plaintiffs were named in the First Amended Complaint. Only nine have actively prosecuted the case through the *Jama* action counsel. The others have been sent to other detention centers in the United States or have

been deported or voluntarily left the United States. Counsel has been unable to communicate with them, and they have not opted out of the *Brown* action. The claims of these *Jama* Plaintiffs will be dismissed without prejudice and they will be recognized as members of the *Brown* action class.

**9.** As noted above, Plaintiffs have agreed to drop their FLSA claims.

**10.** The *Jama* Plaintiffs agree that under *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) their constitutional claims against Esmor must be dismissed.

INS and Esmor under which the *Jama* Plaintiffs were allegedly third party beneficiaries. The claims listed in (iii) and (iv) above correspond with claims that the *Brown* action advances.

The Esmor Officers are James Slattery (Esmor's President and CEO), Aaron Speisman (Esmor's Vice President of Finances), John Lima (a facility administrator for a period of time and assistant facility administrator for a period of time), Willard Stovall (facility administrator for a period of time) and Richard Staley. The claims asserted against these officers are as follows: the claims listed as claims (i) through (vii) asserted against the INS Officials and (viii) New Jersey state law claims of failing to protect Plaintiffs' property, negligent training and supervision.

The Esmor Guards are Willie O. Hunter, Michael Jackson, Tommie Lee Brown, Robert Snead, Okay Nkenke, Phillip Johnson, Kevin Brodie, Dorian Hunter, Michael Melendez, James Stratford, Corey Stratford, and Irving Brown. Of necessity the claims against each Esmor guard are unique to that guard, and the guards' summary judgment motions can only be resolved in the context of his or her own actions or inactions. In general terms the claims asserted against the guards are similar to most of the ATCA and international law claims, constitutional claims and state law claims that are asserted against the INS Officials.

## B. The Pending Motions

In the *Brown* action Esmor moved for summary judgment.

In the *Jama* action the following motions were filed:

The INS Officials moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the Plaintiffs' *Bivens* (First, Fifth and Thirteenth Amendment) claims for failure to state a claim in that they are barred on their face by the applicable statute of limitations. They also moved for summary judgment on the remaining claims against them. These motions remain pending. The INS Officials also moved for dismissal of the claims of certain defendants for failure to prosecute pursuant to Fed.R.Civ.P. 41(b); and they moved to strike certain of Plaintiffs' submissions in opposition to summary judgment. The Rule 41(b) motion was denied at oral argument: that motion was moot with respect to individual Plaintiffs who failed to opt out of the class action; with respect to Plaintiffs Yower and Nanteza it was denied on the merits. The motions to strike will be denied because the Court has determined to address the objections advanced in them on a point by point basis to the extent necessary in deciding the dispositive motions.

Esmor and Esmor Officers Slattery, Lima, Staley and Speisman moved to dismiss the claims asserted against certain Defendants who had not been served, (including the John and Jane Does 2–50) and moved to dismiss the claims of Sarah Tetteh Yower for failure to prosecute on the grounds that she failed to answer interrogatories or appear for deposition. They also moved to dismiss for failure to prosecute claims asserted by certain of the Jama Plaintiffs. Esmor and the Esmor Officers also moved for summary judgment. In response to the *Jama* Plaintiffs' answering papers they moved (i) to strike Plaintiffs' counter statement of facts and statement of facts pursuant to Local Rule 56.1 and (ii) to amend their amended answer to add the affirmative defense of qualified immunity.[11] The motion to dis-

11. To avoid the necessity of future motions, all individual defendants will be deemed to have moved to amend their answers to add

miss for failure to serve will be granted with respect to Defendants Hughes, Figel, Wilson, Phil, Mohammed, Michelle, Kutz, Hayes, Feder, and Edider[12]; and the claims against those Defendants will be dismissed without prejudice under Fed. R.Civ.P. 4(m). The *Jama* Plaintiffs assert Defendant Vanderpuye (who is included in the motion to dismiss for failure of service) was served but has not answered. He will be dismissed without prejudice on the Court's motion for failure of Plaintiffs to prosecute by filing a timely entry of default or otherwise. The motion to dismiss for failure to prosecute was denied at oral argument: like the similar motion by the INS Officials, that motion was moot with respect to individual Plaintiffs who failed to opt out of the class action; with respect to Plaintiff Yower, it was denied on the merits. Decision will continue to be reserved on Esmor's motion for summary judgment. Its motions to strike will be denied, and the arguments advanced in them will be considered in assessing the evidence advanced by Jama Plaintiffs in opposition to summary judgment.

Esmor officer Stovall moved for summary judgment.

Esmor Guards Willie O. Hunter and Jackson moved for summary judgment. The claims against Willie O. Hunter were dismissed at oral argument with Plaintiffs' consent (June 30, 2004).

Esmor Guards Tommie Lee Brown, Snead, Nkenke, Johnson and Brodie moved for summary judgment. They also

moved for leave to file an amended answer to assert the defense of qualified immunity. The claims against Tommie Lee Brown and Snead were dismissed at oral argument with Plaintiffs' consent (June 30, 2004).

Esmor Guards Dorian Hunter, Melendez, James Stratford and Corey Stratford moved for summary judgment. The Claims against James Stratford and Corey Stratford were dismissed at oral argument with Plaintiffs' consent (June 29, 2004). (A consent order granting summary judgment in their favor was entered in favor of James Stratford and Corey Stratford on July 13, 2004.)

Esmor guard Irving Brown moved for summary judgment and moved for leave to file an amended answer to assert the affirmative defense of qualified immunity. The claims against him were dismissed at oral argument with Plaintiffs' consent June 29, 2004. Subsequently, an order granting summary judgment in his favor was entered on July 13, 2004.[13]

A group of professors of international law has also moved for leave to file an brief as amicus curiae. That motion was granted at oral argument June 29, 2004.

### C. Facts Relevant to Esmor's Motion for Summary Judgment in *Brown*

As already noted, the Plaintiff class in *Brown* consists of all detainees who were incarcerated at the Facility during its operation from August 1994 to July 1995.

the affirmative defense of qualified immunity if that defense has not already been asserted.

**12.** The motion to dismiss claims against John and Jane Doe Defendants 2–50 will also be granted, as Plaintiffs have not amended their claims to identify these Defendants.

**13.** That order was entered on the assumption that *Jama* Plaintiffs had consented to it. Sub-

sequently a dispute has arisen as to exactly what *Jama* Plaintiffs intended to agree to at oral argument: they contend that they agreed to the dismissal of claims against Irving Brown but not to the entry of judgment in his favor. The court and the parties are awaiting the preparation of a transcript of the proceedings, which will reveal whether the entry of judgment was in fact appropriate.

Plaintiffs allege that they were subjected to intolerable living conditions and numerous abuses during their detention, and they have presented substantial evidence in support of those allegations.[14] Plaintiffs quote testimony by former detainees regarding beatings they suffered and others that they witnessed. They also quote testimony from an Esmor employee, Phillip Johnson,[15] who recounts that another employee (a supervisory guard by the name of William Wallington) would talk, even while conducting orientation of new guards, of having to beat detainees. Testimony also recounts abuses connected to the use of segregation: for example the shackling of detainees for long periods in segregation, and the denial of clothing and blankets to detainees in segregation.

Detainee testimony also includes accounts of routine strip searches, including late night searches conducted as part of training exercises for the so called "SERT Team" (for "Special Emergency Response Team," also referred to as a "SORT Team"). Wallington himself testified to conducting such exercises, which, according to his testimony, were taped (strip searches included) for use in instruction at other facilities.[16] The SERT Team exercises were performed by guards in black uniforms and helmets, equipped with shields and batons; there is testimony that dogs were used in connection with the SERT Team searches, and that the searches included body cavity searches. (It goes almost without saying that the detainees were not advised that these exercises were not real operations.) The testimony provided by Plaintiffs also includes accounts of sexual harassment of detainees—including guards' solicitation of sexual favors from detainees and instances in which guards watched detainees shower; and it includes accounts of humiliation and verbal abuse, including the use of racial epithets.

Plaintiffs also cite testimony in support of their allegations of deficient living conditions. These include accounts of sleep deprivation; denial of sanitation and personal hygiene materials; unsanitary clothing; dirty and foul smelling toilets and showers; and denial of fresh air and exercise.

Additional evidence for Plaintiffs' claims of abuse and harassment comes from a report (the "Report" or the "Interim Report") prepared by INS personnel (at the behest of INS Commissioner Doris Meissner), dated July 20, 1995. The assessment team that prepared the Report (the "Assessment Team") was at first charged with looking into complaints of abuse and misconduct at the Facility; after the riot its work was expanded to include an examination of the causes of the disturbance and the response to it by Esmor and others. The Assessment Team "discovered that detainees were subjected to harassment, verbal abuse, and other degrading actions perpetrated by some ESMOR guards." Report 5. It found that allegations of verbal abuse and general disrespect toward detainees were "credible" and that such actions were common on all shifts. *Id.* The Report also recounts allegations (though without conclusively endorsing them) of physical abuse on the night shift at Facility, stating that "the evidence sug-

---

**14.** The following account draws substantially upon *Brown* Plaintiffs' Counter–Statement of Facts submitted in response to Esmor's summary judgment motion, and on the testimony quoted in the Counter–Statement.

**15.** At some points in the record Johnson's first name appears with one L; at others it appears with two. The papers submitted in his behalf spell it with two.

**16.** No tape of the exercises is in evidence.

gests that these incidents were part of a systematic methodology designed by some ESMOR guards as a means to control the detainee population and to intimidate and discipline obstreperous detainees through the use of corporal punishment." *Id.* at 5. According to the Report, the Assessment Team "found the complaints [apparently including some of physical abuse] to be credible" and requested assistance with a follow up investigation by the Office of Internal Audit.[17] *Id.* at 6. The Report noted that the Assessment Team "uncovered the identities of those ESMOR guards principally responsible for the maltreatment of detainees"—an "abuser group" consisting of five guards and two guard-lieutenants—and that six of these employees were "removed from the contract, terminated, or allowed to resign by ESMOR." *Id.* at 7.

As noted above, Plaintiffs attribute the abuses at the Facility to negligence on the part of Esmor in the hiring, retention, training, and supervision of its personnel. Plaintiffs' support for these negligence claims comes in large part from the Interim Report. The Report includes findings that Esmor (in part because of its low pay scale) was unable to attract qualified guards, that (at least in part because of difficulty finding replacements) it retained guards known to be "questionable" or "marginal" and that such retention was a contributing factor in abuse of detainees, as undesirable guards whom Esmor retained were implicated in the abuse. Report 15–16. The Assessment Team also

found that training of Esmor employees was inadequate and failed to fulfill the requirements of the INS contract with Esmor, *id.* at 18–20, that many Esmor employees worked for extended period without required security clearance, *id.* at 16–17, and that no real control was exercised over the Esmor guards by their mid-level supervisors. *Id.* at 7. For its part, Esmor points to training records that suggest that at least some guards fulfilled training requirements under its contract with the INS. (Plaintiffs dispute the authenticity of the records.) Esmor also contends that appropriate policies were formulated and made available to its employees. Esmor also notes that under the contract guards were permitted to work in the Facility before completing their training as long as they were under proper supervision. Esmor also points to testimony indicating that the INS agreed to permit employees to work in the Facility while awaiting security clearance.

The contract (the "Contract") under which Esmor operated the Facility contained a number of provisions relating to the hiring, training, and supervision of employees; and it imposed on Esmor the obligation to ensure the safety and protect various rights of the detainees. Subsection 1 of the Contract required Esmor to prepare, submit for INS review, and abide by certain materials, including an operations manual providing policies and procedures for operating and maintaining the Facility. The manual was to be made

---

**17.** Similarly, in another section of the Report, the Assessment Team, discussing allegations of assaults and other abuse, stated that it "had the opportunity to judge the testimony presented and to observe the demeanor of those persons involved, including attorneys, detainees, and guards, some of whom acted as confidential informants. The Team finds that the overall testimony on these matters

is sufficient to warrant further investigation. If the allegations are true, this is in violation of the contract which requires the contractor to provide detainees protection from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment. This also represents possible criminal violations." *Id.* at 30–31.

available to employees, conform to "ACA standards," and "complement INS policy."

Subsection 2, entitled "Personnel," required Esmor to provide staffing for the facility and adequate supervision, and provided certain standards for employee conduct and discipline. This section also provided for security clearance procedures, under the heading "Security Requirements (Non-classified Contract)": "The government shall have and exercise full and complete control over granting, denying, withholding, or terminating clearances for employees. The government may, as it deems appropriate, authorize and grant temporary clearance (waiver) to employees of the contractor...." This subsection also provided that employees could not begin working until they had received clearance.

Subsection 3 of the Contract addressed training requirements, providing that no employee could work independently until "initial training requirements" had been completed. With respect to security employees, the contract required a minimum of 160 hours of orientation and training during the first year of employment, 40 hours of which were to be completed within the first 14 days of employment and prior to an employee's being "independently assigned" to a post. Subsection 3 included a list of required topics for training. It also provided that all training courses were to be approved by the INS, and that a complete training plan was to be submitted.

Subsection 10 of the Contract addressed "Security and Control"—emphasizing, "The most important aspect of this contract is providing for the secure detention of the detainees." This subsection includes provisions requiring security practices at the Facility—from the inspection of security equipment to searches for contraband. It also includes provisions governing the use of force: "The use of physical force by facility personnel is restricted to instances of justifiable self-protection, protection of others, protection of property and prevention of escapes and to only the degree necessary.... In no case shall force be used as punishment or discipline." This subsection also limited the use of restraint equipment to instances justified by the prevention of escapes, medical reasons, or the prevention of injury or damage to property. It also limited the use of strip searches (except upon entry to the Facility) to instances where they were supported by reasonable suspicion and approved by the facility administrator; body cavity searches were to be performed only with reasonable cause and with prior authorization from the INS "COTR" responsible for overseeing the contract. All strip searches were to be conducted in private.

Under the heading "Detainee Rights, Rules, Discipline and Privileges," Subsection 12 of the contract provided, "The contractor shall provide detainees protection from personal abuse, corporal punishment, personal injury, disease, property damage, and harassment." It also obligated the Esmor to ensure that "all detainee rights are observed" (specifically barring discrimination on the basis of race and other categories, and obligating the contractor to recognize detainees' rights to practice their religions). The same subsection provided that all discipline would be "strictly administered in accordance with the INS's policy for disciplinary procedures at its service processing centers."

## DISCUSSION

The following discussion directly addresses Esmor's motion for summary judgment in the *Brown* action. Some of the issues raised in connection with that motion also bear on the motions for sum-

mary judgment in *Jama*, and where such an overlap occurs relevant arguments advanced in *Jama* have also been considered. But in the interests of simplicity and clarity, no decision on any aspect of the *Jama* summary judgment motions will be issued at this time.

## A. The Admissibility of the INS Interim Report

■ In opposing the motions for summary judgment, Plaintiffs in both *Jama* and *Brown* have made extensive use of the interim assessment report on the Elizabeth facility prepared by INS officials at the direction of INS Commissioner Doris Meissner. Defendants in both actions contend that the Report is inadmissible hearsay. In *Brown*, Esmor's objections are contained in its reply brief. Defendants in *Jama* have also objected to the Report in connection with separate motion to strike portions of *Jama* Plaintiffs' opposition papers, and those objections advance arguments not set forth in *Brown*—that the Report has not been authenticated and that it is inadmissible under Fed.R.Evid. 403. The following discussion addresses these arguments—attributing all of them to all the Defendants in both actions collectively. The Report has been properly authenticated; it is admissible as a "factual [finding] resulting from an investigation made pursuant to authority granted by law" for the purposes Fed.R.Evid. 803(8)(c); and it is not inadmissible under Rule 403.

According to the account in the Interim Report itself, on May 30, 1995 Commissioner Meissner directed the Headquarters Detention and Deportations Division ("HQDDD") to conduct a "program review and investigation" of the Elizabeth detention center. The review was prompted by complaints about conditions at the facility. HQDDD assembled the Assessment Team,

drawn from various INS programs, and an assessment was conducted June 7–10. After the June 18 disturbance at the center, the investigation was expanded to examine "the probable causes of the disturbance, adequacy of response by ESMOR and INS personnel, and emergency plans that were in effect at the time of the disturbance." The Report contained findings with respect to numerous conditions at the Esmor facility, and with respect to Esmor practices including hiring, training, and supervision.

■ Under Fed.R.Evid. 803(8)(c), the rule against hearsay does not bar "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... in civil actions and proceedings ..., factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The proponent of such a record or report must establish the foundation for it by showing that it does in fact set forth "findings resulting from an investigation made pursuant to authority granted by law"; once the foundation is established, the evidence will be admitted unless the party opposing it shows that it is untrustworthy. *See Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir.2000); *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.*, 505 F.Supp. 1125, 1146 (E.D.Pa.1980), *rev'd. on other grounds*, 723 F.2d 238 (3d Cir.1983), *rev'd*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ Defendants' argument that the Report has not been authenticated is mistaken. The head of the team that prepared the Report identified it during his deposition. *See* December 11, 2000 Deposition of

Terry Nelson 73.[18] "The burden of proof for authentication is slight. All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir.1985). Testimony such as Nelson's here is easily sufficient to make the necessary prima facie showing of authenticity. *See, e.g., Link v. Mercedes–Benz of North America, Inc.*, 788 F.2d 918, 928 (3d Cir.1986); *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir.1994) (noting that a police report was properly authenticated by deposition testimony).

■ Progressing to the issue of the Report's admissibility under Rule 803, initially it must be noted that the Interim Report satisfies the foundational requirements set forth in Rule 803(8)(c): it contains extensive factual findings that resulted from an investigation pursuant to authority granted by law. The Assessment Team was instructed by Commissioner Meissner to conduct an investigation of conditions at the Facility and (after the disturbance) to examine and report on the causes of the disturbance and the response to it. Defendants contend that the work of the Assessment Team somehow did not amount to an investigation for the purposes of Rule 803(8)(c), and they point to testimony by the chief of the Assessment Team, Terry Nelson, indicating that the team did its work under time pressure and could have conducted a more extensive investigation. Nelson's testimony does suggest (not sur-prisingly) that his team could have conducted a more thorough inquiry if it had had more time, and he makes it clear that his team was not capable of (or asked to) conduct a criminal investigation. *See, e.g.*, Nelson 2/12/01 517–18. There are also indications in the Report that the Assessment Team thought additional investigation was warranted to confirm its findings.[19] But the investigation that produced the Interim Report is no less an investigation for the purposes of the rule merely because it could have been more extensive or because it was not intended to provide a basis for criminal proceedings. The Report itself frequently refers to the work of the Assessment Team as an "investigation."

Defendants also argue that because the Report was by its terms "Interim"—because at the time it was issued the possibility of a revised or supplemented final report was considered—the Report does not qualify as "findings" resulting from an investigation for the purposes of the rule. It is however clear, at least in this Circuit, that the fact that findings are subject to review or revision, though it bears on their trustworthiness, does not remove them from the category of findings for the purposes of the rule.

> [T]he effect on admissibility of the fact that a particular finding was made in the "first inning," so to speak, of a protracted process should be considered under the rubric of trustworthiness and not, as the defendants contend, as part of the definition of "findings."

---

**18.** The set of Master Exhibits submitted in connection with the motions for summary judgment in *Jama* include (as Exhibit 17) transcripts of deposition testimony by Nelson. The testimony was apparently taken on five days: December 11, 2000; December 12, 2000; February 12, 2001; February 13, 2001; and July 10, 2001. Citations to this testimony (and to any other cited testimony) will be by name of deponent, date, and page number.

**19.** Although the Assessment Team found allegations of abuse credible, it also indicated that further investigation was warranted to confirm their truth. Report 5–6, 30–31.

*Zenith,* 505 F.Supp. at 1146; *see also In re Japanese Elec. Prod. Antitrust Litig.,* 723 F.2d at 273 (concluding that the preliminary nature of a report did not prevent it from being admissible under Rule 803(8)).[20]

In addition to containing "findings" for the purposes of the rule, the Report is also the product of an investigation "pursuant to authority granted by law." The Assessment Team consisted of public officials conducting an investigation pursuant to the INS's clear legal authority to ensure that Esmor complied with the terms of its contract and with the laws and regulations applicable to the INS functions it was performing.

■ Given that the basic requirements for admissibility under Rule 803(8)(c) are satisfied, Defendants have the burden of showing that the Report is untrustworthy. "Since [Rule] 803(8)(C) is premised on the assumption that public officers perform their duties properly without motive or interest other than to submit accurate and fair reports," the party opposing admission of a public official's report "faces a heavy burden in proving untrustworthiness." *Complaint of Nautilus Motor Tanker Co., Ltd.,* 862 F.Supp. 1251, 1255 (D.N.J.1994). Numerous considerations have been applied in the trustworthiness analysis. As the Court of Appeals noted in *Coleman v.*

*Home Depot, Inc.,* 306 F.3d 1333, 1342 (3d Cir.2002), the advisory committee note offers a non-exclusive list of four factors: (1) the timeliness of the investigation; (2) the special skill or experience of the official; (3) whether a hearing was held and the level at which conducted; (4) possible motivation problems." Also in *Coleman,* 306 F.3d at 1342, the Court of Appeals listed (though it did not definitively endorse) the factors that had been applied to the trustworthiness analysis by the district court in *Zenith,* 505 F.Supp. at 1147:

(1) The finality of the agency findings, i.e., the state of the proceedings at which the findings were made (whether they are subject to subsequent proceedings or de novo review), and the likelihood of modification or reversal of the findings.

(2) The extent to which the agency findings are based upon or are the product of proceedings pervaded by receipts of substantial amounts of material which would not be admissible in evidence (e.g., hearsay, confidential communications, ex parte evidence), and the extent to which such material is supplied by persons with an interest in the outcome of the proceeding.

(3) If the findings are products of hearings, the extent to which appropriate safeguards were used (Administrative Procedure Act, Due Process), and the

---

**20.** The District Court in *Zenith* did state that "[where a] staff report is submitted to a commission or other public agency charged with making formal findings, only those factual statements from the staff reports that are approved and adopted by the agency will qualify as 803(8)(C) 'findings.' " 505 F.Supp. at 1145. But this limitation does not apply to the Interim Report. The Interim Report was not a mere staff report submitted to body charged with making formal findings: HQDDD and the Assessment Team, which issued the Report, were themselves directed to produce findings and were themselves responsible for the contents of the Report. The Report was provided to Commissioner Meissner not so that the INS could adopt or approve the findings, but rather as a possible basis for action by the agency. Moreover, even if it were necessary for the INS to have approved or adopted the Report's findings, it appears to have done so, at least implicitly, by referring to those findings as the basis for allowing Esmor's contract to lapse. That decision is reflected in a July 21, 1995 letter directed to Esmor by Commissioner Meissner, which states, "Based on the findings [the Report] contains, we are prepared to let [the Esmor] contract lapse."

extent to which the investigation complied with all applicable agency regulations and procedures.

(4) The extent to which there is an ascertainable record on which the findings are based.

(5) The extent to which the findings are a function of an executive, administrative, or legislative policy judgment (as opposed to a factual adjudication) or represent an implementation of policy.

(6) The extent to which the findings are based upon findings of another investigative body or tribunal which is itself vulnerable as a result of trustworthiness evaluation.

(7) Where the public report purports to offer expert opinion, the extent to which the facts or data upon which the opinion is based are of a type reasonably relied upon by experts in a particular field.

Defendants contend that the application of the relevant advisory committee factors and *Zenith* factors compels the conclusion that the Interim Report is untrustworthy. In fact, although the Interim Report is not without its weaknesses, it is not untrustworthy under Rule 803(c). Defendants place particular emphasis on the Report's "interim" status—its lack of finality. They cite (although they do not quote or accurately characterize) testimony by Nelson to the effect that the Assessment Team was aware of the "potential" for another, final report when the Interim Report was issued. Nelson 12/12/00 308–309. Nelson testified that when the Interim Report was concluded the Assessment Team was aware that some investigations were still going on and that some facts had not yet been conclusively established. Nelson

12/12/00 308–309; Nelson 2/12/01 464. Nelson's testimony does indicate that the Assessment Team could have arrived at more definite findings on more topics if it had had more time, and there is language in the Report itself indicating that more investigation was warranted to produce more definite findings on some topics. But Nelson's testimony also makes it clear that the Report does not present firm conclusions as to any facts on which the Assessment Team had insufficient data or did not agree. Nelson 2/12/01 494–95. Nelson in fact testified that he regarded the Report as a "final product" (as opposed to a draft) and that would not have changed a word of the Report. Nelson 2/13/01 924–25.[21] Defendants also highlight Nelson's references to a separate report, the "Nordmark Report," that he thought (at least at some point) would eventually be attached as an addendum to the Interim Report. Defendants argue that the absence of the Nordmark report from the Interim Report renders the Interim Report incomplete and untrustworthy. In fact Nelson's testimony itself indicates that the Nordmark Report covered a subject matter (case management) distinct from the topics addressed in the Interim Report. Nelson 2/13/01 845–46. It does not appear that the absence of the Nordmark Report in any way diminishes the trustworthiness of the Interim Report as an assessment of Esmor's operations. As already noted, the Court of Appeals has made it clear that the preliminary or interim nature of a report does not preclude admissibility under Rule 803(8)(c). In this case the findings of the Interim Report are sufficiently firm for the Report not to be untrustworthy under the rule. The fact

---

21. Esmor also cites (again without accurately characterizing) passages in which Nelson discusses his team's inability to conduct a criminal investigation, Nelson 2/12/01 516–18; Nelson 12/11/00 117. Based on these citations Esmor suggests that the Assessment Team was not capable of issuing reliable findings of any sort. In fact Nelson's testimony does not represent any such general indictment of the Assessment Team's abilities.

that they may have been in some respects preliminary findings, that further investigation of the same set of facts may have been contemplated, does not by itself require a finding that they are unreliable. *See In re Japanese*, 723 F.2d at 273. Perhaps most compellingly, it is important to note that the Report was never superseded, and that the INS did ultimately act on its findings by allowing the Esmor contract to lapse.

■ Defendants also contend that the preparation of the Interim Report was affected by bias. But the evidence they cite does not show that the investigation was tainted. It is clear that the Assessment Team was under some pressure to produce results: the investigation was conducted over a limited time, there is evidence that press reports and other disclosures about conditions or abuses at the Facility created pressure for the completion of the report. There are also indications that at least one U.S. Congressional Representative (Representative Menendez) was particularly insistent that the INS investigate and address what he saw as problems at the Facility. (It appears that one source of information for the Report was a confidential informant, an Esmor employee, who was contacted through the Congressman's office.) None of this evidence however shows that the investigation as a whole was biased. Pressure for a quick result is not the same as pressure for any particular result in the substance of the report, and even if there may have been a desire in some quarters for a damning report on Esmor's operations, there is no evidence that the Assessment Team harbored or was affected by any such sentiments.[22] Defendants also suggest that the Report may have been tainted by a desire on the part of INS

Official William Slattery to embarrass the INS District Director Warren Lewis. Nelson's testimony makes it clear that to the extent that there was any pressure applied to embarrass Lewis, Nelson refused to submit to it. Nelson 2/13/01 721–22. His testifies clearly that he and his team did not set out to blame anyone for problems at the Elizabeth facility. Nelson 2/12/01 444–45.

The third major ground on which Defendants attack the report is its use of hearsay. It is evident from the Report itself and from Nelson's testimony that much of the Report is not based on the personal observations of the Assessment Team. Indeed, given the nature of the task to which the Team was assigned, it would have been absurd for it to limit its investigation to personal observation. It is clear that the Assessment Team even considered multiple levels of hearsay in producing some of its findings: Nelson testifies that many of the first accounts of abuses gathered by the Team came from detainees' attorneys. Nelson 2/12/01 432. Defendants take exception to the use of hearsay from any source, and they suggest that the bias of the sources with whom the Assessment Team dealt tainted the Report. But the Court of Appeals has made it plain that the fact that findings are not based on the personal knowledge of an investigator is not by itself fatal to admissibility under Rule 803(8). *See Clark*, 20 F.3d 1290. Further, even where a witness is biased, his or her bias is not imputed to the investigator. *Id.* Here the Assessment Team evidently drew its information from a range of witnesses, including not only detainees but also Esmor employees; and Nelson's testimony indicates that he brought an appropriate skepticism to his

**22.** Indeed, to the extent that the INS as a whole might be assumed to have hoped for a particular result from the investigation, it would presumably have wished for a finding that the facility was well run and that abuses were minimal or non-existent.

interactions with the various witnesses. Defendants highlight portions of Nelson's testimony in which he expresses such skepticism with regard to uncorroborated allegations made by detainees in interviews. *See, e.g.,* Nelson 2/12/01 510–15, 595. But in doing so they only succeed in reinforcing the trustworthiness of the Report: it is clear that Nelson was not at all disposed to uncritically incorporate statements of interested parties into the Report's findings. Rather, he and his team apparently took considerable pains to ensure that those findings had proper support. The fact that the Report's findings are to some extent based on hearsay does not, either by itself of in combination with other factors, compel the conclusion that the Report is unreliable.[23]

Similarly, although the fact that there is no record of the sources on which the findings are based might to some extent undercut the reliability of the Report, it does not do so to any significant degree. The fact that the Report was not the product of a hearing is also of little importance, particularly because the fact finding at issue here is not of a kind that would ordinarily emerge from a hearing. *See In re Japanese,* 723 F.2d at 268.

Other commonly applied factors either favor admission or are irrelevant. For example, it is clear that the investigation was timely; it is also evident that the Assessment Team brought to its work considerable expertise and familiarity with the matters it was directed to examine; and it does not appear that the Report's findings are the product of policy judgment rather than purely factual assessment.

In sum, Defendants have not shown that the Report's findings are untrustworthy,

and accordingly they are admissible under Rule 803(8)(c).

Defendants' Rule 403 objection is equally unavailing. The probative value of the Report's findings is considerable, and it does not appear to be outweighed by any of the countervailing factors set forth in Rule 403. Defendants suggest that the entire Report should be excluded because the task of separating admissible findings from other, inadmissible portions of the Report would place an undue burden on the Court. Given that the summary judgment records in *Jama* and *Brown* contain thousands of pages of materials, with the briefs alone accounting for at least several hundred, the argument that the Court's resources will be overextended by the task of highlighting the admissible portions of an approximately 75 page report is not particularly persuasive.

### B. Summary Judgment Standard

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

Rule 56(c) imposes a burden on the moving party simply to point out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The evidence need not be in a form that would be admissible at

---

**23.** It should be noted however that the hearsay statements recounted in the Report are not admissible to prove their truth just because the Report itself and its findings are.

To the extent that the Report recounts allegations that are not endorsed in its findings, those allegations are not admissible under Rule 803(8)(c).

trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. But Rule 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge"; and hearsay within such affidavits or testimony may be considered, but only where the hearsay declarant can be produced at trial to offer his or her statements in admissible form. *See Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 470 (3d Cir. 1998); *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.*, 998 F.2d 1224, 1234–35 (3d Cir.1993); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 960–61 (3d Cir.1996).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Further, a party may not simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 247, 106 S.Ct. 2505. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

## C. Claims Based on Negligent Hiring, Retention, Training, and/or Supervision

■ Esmor contends that Plaintiffs have failed to present sufficient evidence that Esmor was negligent in the hiring, retention, training, or supervision of its guards; it also argues that Plaintiffs have not pointed to sufficient evidence of a causal link between any such negligence and injuries to members of the Plaintiff class. Contrary to Esmor's contentions, there is ample evidence in the record to support Plaintiffs' negligence claims.[24]

The elements of a claim of negligent hiring or retention were set forth by the New Jersey Supreme Court in *Di Cosala v. Kay*:

[T]he tort of negligent hiring has as its constituent elements two fundamental requirements. The first involves the knowledge of the employer and foreseeability of harm to third persons. An employer will only be held responsible for the torts of its employees beyond the scope of the employment where it knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons. The second required showing is that, through the negligence of the employer in hiring the employee, the latter's incompetence, unfitness or dangerous characteristics proximately caused the injury.

---

24. As in the relevant portion of the background section above, references to the record in this and subsequent sections refer, unless otherwise noted, to *Brown* Plaintiffs' CounterStatement of Facts and the testimony cited and quoted within it.

91 N.J. 159, 173–74, 450 A.2d 508 (1982) (citations omitted). Although this language from *Di Cosala* might be read to suggest that either actual knowledge or something resembling recklessness on the part of the employer might be a requirement of the claim, cases cited by the Supreme Court in recognizing the tort confirm that the employer's liability is in fact based on negligence—that the employer can be liable if it "should have known" of the danger presented by an employee. *See F & T Co. v. Woods*, 92 N.M. 697, 594 P.2d 745, 747 (1979); *Thompson v. Havard*, 285 Ala. 718, 235 So.2d 853, 858 (1970), both cases cited in *Di Cosala*, 91 N.J. at 173–74, 450 A.2d 508. Esmor contends that there is insufficient evidence in the record to show that Esmor hired or retained employees whom it should have recognized were so unqualified as to present a risk of harm. In fact the INS Interim Report found that the "failure to recruit sufficiently qualified applicants and to dismiss questionable or marginal personnel" was "a contributing factor in the abuse of detainees," Report 15; and clearly, given the repeated and systematic nature of the abuses described in the record, even if Esmor could not be expected to have recognized a dangerous lack of quali-

fications in its employees when it hired them, there is certainly enough evidence to support an inference that it should have known employees were dangerous once they had begun to abuse the detainees.

■ There is also plenty of evidence in the record to support Plaintiffs' negligence claim on a theory of negligent training and/or supervision. It is clear that under New Jersey law negligence claims may be maintained on the basis of deficient supervision and training, *see Frugis v. Bracigliano*, 177 N.J. 250, 273–74, 827 A.2d 1040 (2003)[25]; and the record here provides strong indications that Esmor's supervision and training of its guards were profoundly deficient. The parties devote considerable effort to a dispute over whether Esmor guards received the amount of training (measured in hours) required under the Contract. The INS Interim Report indicates that at least some guards may not have received the required amount of instruction. But there is no need to resolve that question for the purposes of the present summary judgment motion. Even if Esmor guards did receive the hours of training required under the Contract, and even if that amount of proper training would have been suffi-

**25.** Whereas the Court in *Di Cosala* set forth requirements peculiar to claims of negligent hiring or retention, the Court in *Frugis* did not similarly establish any requirements specifically applicable to claims of negligent supervision or training—simply reciting the general standards for negligence claims. Accordingly, this discussion addresses the theories of negligent hiring and retention together with each other and separately from the theories of negligent training and supervision; the supervision and training theories are addressed together. The operative Amended Complaint in *Brown* presents all Plaintiffs' negligence theories as part of a single cause of action—encompassing negligence in failing to properly screen, hire, train, supervise, monitor, discipline, and otherwise manage" employees. Logically it appears that Plain-

tiffs' claims might best be analyzed as a single negligence claim: the hiring of an inexperienced employee is not negligent if he is properly trained and supervised; and conversely even very limited training or supervision may not be insufficient for a highly qualified or experienced employee. But the cases appear to suggest that hiring and retention claims are distinct from claims arising from training and supervision. In its papers Esmor addresses the hiring, training, and supervision theories almost as though they were three separate claims. For their part Plaintiffs present their arguments with respect to hiring/retention and training together (theorizing that the hiring or retaining of an unqualified employee may not be negligent if the employer properly trains him).

cient to prepare them for their jobs, there is still evidence to support the inference that the training was negligent: even if the quantity of training was adequate, the quality may not have been. There is evidence in the record, most glaringly in the testimony regarding SERT Team exercises, that Esmor guards actually received training *that itself involved* the abuse of detainees. There is also evidence (in testimony by Esmor guard Phillip Johnson) that the practice of "tuning up" or beating detainees was discussed during the orientation with which guards were provided.

Similarly with respect to supervision, the INS Interim Report found that "no real control" was exercised over Esmor guards by mid-level supervisors. Report at 7. This finding is obviously evidence of negligent supervision on Esmor's part. Testimony that training exercises repeatedly involved the abuse of detainees also constitutes evidence that supervision was unreasonably deficient.

Because Plaintiffs have presented enough evidence to support their negligence claims, Esmor's motion for summary judgment as to those claims will be denied.[26]

Esmor has also moved for summary judgment as to Plaintiffs' claim, asserted separately in the Amended Complaint, that Esmor knowingly, recklessly and intentionally failed to screen, train, and supervise its employees. Esmor argues that courts have not recognized any such intentional tort. Plaintiffs have not directly opposed this argument; and at least for all practical purposes there does not appear to be any need for them to do so: if

Plaintiffs can ultimately show that Esmor intentionally or recklessly (rather than merely negligently) failed to properly screen, train, or supervise its employees, they will of course have shown the necessary culpability to prevail on their negligence claims. Because Plaintiffs' claim of intentional wrongdoing is redundant, and because they have not argued that it is appropriately viewed as a cause of action distinct from their negligence claim, Esmor's motion for summary judgment will be granted as to that claim.

Esmor also argues that summary judgment is appropriate because Plaintiffs have failed to provide an affidavit of merit in support of their claims. This argument is completely out of place. N.J.S.A. § 2A:53A–27 provides that an affidavit of merit is required in certain actions against "licensed persons" within the meaning of the statute. "Licensed persons" for the purposes of the statute are defined in N.J.S.A. § 2A:53A–26. They include such persons as doctors, lawyers, dentists, and accountants. The guards and Esmor officials whose conduct is at issue in this case are clearly not within the definition of licensed persons for the purposes of the affidavit of merit requirement.

### D. Third Party Beneficiary Claims

■ Plaintiffs have asserted claims as purported third party beneficiaries of the Contract between Esmor and the INS. Because the language of the Contract does not support Plaintiffs' contention that they were intended third party beneficiaries of the agreement, their breach of contract claims fail.

---

**26.** Although summary judgment is inappropriate because there is evidence that Esmor's negligence caused the conditions and abuses to which members of the class were subjected, it should be noted that problems of proof with respect to individual class members may remain. Class members seeking compensation for their injuries may be required to show that they were injured and that their injuries resulted from the conditions and abuses at issue.

Apart from their argument over the merits of the third party beneficiary claims, the parties disagree over choice of law. Defendants contend that these claims are garden variety state law contract claims to which New Jersey law should apply; Plaintiffs contend that, because their claims arise from a federal contract, federal common law should govern. Because the two bodies of law do not materially disagree on the issue of third party beneficiary status under government contracts, there is no need to resolve the choice of law dispute. Under New Jersey law, "[t]o determine whether a person qualifies as a third-party beneficiary, the test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts." *Werrmann v. Aratusa, Ltd.*, 266 N.J.Super. 471, 476, 630 A.2d 302 (App. Div.1993) (quoting *Rieder Communities, Inc. v. North Brunswick Tp.*, 227 N.J.Super. 214, 222, 546 A.2d 563 (1988) (quoting *Brooklawn v. Brooklawn Housing Corp.*, 124 N.J.L. 73, 77, 11 A.2d 83 (N.J.Err. & App.1940)))). "The contractual intent to recognize a right to performance in the third person is the key. If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing." *Broadway Maintenance Corp. v. Rutgers, State University*, 90 N.J. 253, 259–60, 447 A.2d 906 (1982) (citing Restatement (Second) of Contracts § 302 (1979)). In applying federal common law to questions of third-party beneficiary status, federal courts in this circuit apply the same rules as New Jersey courts. *See Angleton v. Pierce*, 574 F.Supp. 719, 735 (D.N.J.1983) (noting that both federal and New Jersey common law apply the same "general principle . . . that a third party acquires enforceable contract rights if the parties to the contract intended to confer a benefit upon him, but not if he benefits only incidentally from the con-

tract"), *aff'd* 734 F.2d 3 (3rd Cir.1984). Both federal and New Jersey cases on third party beneficiary status draw upon the Restatement and the Restatement (Second) of Contracts. *See, e.g., Broadway Maintenance*, 90 N.J. at 259–60, 447 A.2d 906; *Angleton*, 574 F.Supp. at 735; *Nguyen v. United States Catholic Conference*, 548 F.Supp. 1333 (W.D.Pa.), *aff'd*, 719 F.2d 52 (3d Cir.1983); *Allstate Transp. Co., Inc. v. Southeastern Pennsylvania Transp. Authority*, No. CIV. A. 97–1482, 2000 WL 329015, *15–*17 (E.D.Pa. March 27, 2000) (stating that "Federal courts in this Circuit apply the rules for government contracts established in the second Restatement of Contracts").

Plaintiffs' claims as purported third party beneficiaries in this case are therefore governed by the principles discussed by the district court and the Court of Appeals in *Nguyen*, 548 F.Supp. 1333, 719 F.2d 52. An application of those principles yields the conclusion that Plaintiffs do not have the right to sue as third party beneficiaries of the Contract between Esmor and the INS. As the Court of Appeals noted in *Nguyen*,

The first and second Restatements of Contracts, although written half a century apart, echo a consistent theme on the issue of beneficiaries of government contracts:

§ 145. BENEFICIARIES UNDER PROMISES TO THE UNITED STATES, A STATE, OR A MUNICIPALITY.

A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or at-

tempting to perform it, or of failing to do so, unless,

(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences....

Restatement of Contracts at 173 (1932).

§ 313. GOVERNMENT CONTRACTS

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

(a) the terms of the promise provide for such liability; or

(b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

Restatement (Second) of Contracts at 472 (1981).

719 F.2d at 55. In *Nguyen* Plaintiff refugees had sued as alleged third party beneficiaries of a contract between the federal government and a private charitable agency. Although the government's intent in entering into the contract was clearly at least in part to benefit the refugees, both the district court and the Court of Appeals concluded that they had no standing to sue as third party beneficiaries. 548 F.Supp. 1333, 719 F.2d 52 (stating that plaintiffs had "point[ed] to no provision of the grant agreements that reflects the notion that [the defendant contractor] will be liable to refugees should it fail to perform.") *Ngu-*

*yen*, 719 F.2d at 55. *Nguyen* reflects a recognized presumption against third party beneficiary rights under government contracts. *See Beckett v. Air Line Pilots Ass'n*, 995 F.2d 280, 288 (D.C.Cir.1993) (referring to the "basic contract principle that third party beneficiaries of a Government contract are generally assumed to be merely incidental beneficiaries, and may not enforce the contract absent clear intent to the contrary"). Under *Nguyen's* application of the Restatement approach, members of the public may not sue as third party beneficiaries of government contracts unless the contract contains specific language providing them with the right to do so.

In general, "(g)overnment contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested." [Restatement of Contracts Second, s 313 (1981)] at "Comment." Something more than mere intent to benefit some third party must be shown for the third party to have actionable rights under the contract. *Pennsylvania v. National Ass'n of Flood Insurers*, 378 F.Supp. at 1347–1348. There must be language evincing an intent that the party contracting with the government will be held liable to third parties in the event of nonperformance. *Id.See also Schell v. National Flood Insurers Ass'n*, 520 F.Supp. 150, 157 (D.Colo.1981). Otherwise, the third parties are merely incidental beneficiaries having no actionable rights under the contract. The fact that third parties will benefit more directly from performance of the contract than members of the public at large does not alter their status as incidental beneficiaries. *Id.*

*Nguyen*, 548 F.Supp. at 1348; *see also Allstate*, 2000 WL 329015, *16. Given that members of the public are of course almost

invariably intended to benefit from performance under government contracts, it is not surprising that the mere intent to benefit the public does not confer upon members of the public a right to sue for performance.

Plaintiffs have pointed to no provisions of the INS–Esmor Contract that express specifically any intent to confer a right to performance on any of the detainees. Certainly the Contract contains provisions requiring that detainees not be subjected to abuse. The Contract even provides (in Subsection 12, entitled "Detainee Rights, Rules, Discipline and Privileges") for the protection of certain detainee rights, including rights against discrimination and the right to practice religion. But these provisions, though they show that the INS intended the detainees to benefit under some provisions of the Contract, cannot by themselves show that the parties intended detainees to have rights of action for breach of contract against Esmor. Plaintiffs have not identified any provision or combination of provisions that specifically provide such a right.[27]

### E. Government Contractor Defense

■ Invoking its status as a government contractor, Esmor contends that it is immune from liability for any negligence in hiring, retention, training, or supervision because its policies and practices in these areas were specifically approved by the government. The record, however, provides ample support for Plaintiffs' contentions that Esmor's management of the Elizabeth facility in fact failed to conform to the requirements of its contract in all the relevant areas. Because it is not by any means apparent that the INS approved Esmor's conduct, at this stage at least the government contractor defense does not preclude Esmor's liability for that conduct.

■ Under certain circumstances a government contractor can be cloaked with the government's immunity from suit. As the Supreme Court described it in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 74, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), the government contractor defense applies "[w]here the government has directed a contractor to do the very thing that is the subject of the claim." The defense is typically invoked in cases arising from the design of government equipment. In that context, the defense is available where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Carley v. Wheeled Coach*, 991 F.2d 1117, 1119 (3d Cir.1993) (quoting *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988)). Even assuming that an analogous defense applies to a sufficiently precise government contract for services, Esmor has not established that it applies here. First, it is not clear that under the Contract the INS could be said to have specifically required or approved of particular Esmor practices. Esmor contends, for example, that under the Contract the INS specifically approved all Esmor hiring decisions. But in fact, although the Contract did require all em-

---

**27.** Even in the Subsection of the Contract addressing detainee rights, the topics of rights and discipline are addressed together. The juxtaposition indicates that the rights provisions, though they benefit the detainees, are part of Esmor's promise to the INS to maintain proper order in its facility. Further, the overall purpose of the Contract is plainly not primarily the protection of detainees; it is rather the effective operation of detention facilities.

ployees to receive security clearance from the INS, it does not appear to have given the INS any broad discretion to veto Esmor hiring decisions. Esmor also contends that its pay scale for guards was approved by the INS under the Contract. But although Esmor did pay guards the minimum required, the Contract did not prevent it from paying more, and given Esmor's general responsibility under the Contract to ensure the welfare of detainees, it is not clear that the Contract could be said to have approved guard pay that the record suggests may have been too low to attract and retain qualified personnel. In addition, although the Contract does set forth fairly specific requirements as to the hours of training that various classes of employee must receive, along with an outline of the topics to be covered, and although it requires that Esmor training classes be approved by the INS, it is by no means certain that the INS actually approved even the plans or outlines for such classes.[28] Similarly, although the Contract required Esmor to prepare and submit a policy manual to the INS, it is not clear that the INS ever formally approved the policies contained in any such manual.

Second, and more importantly, even assuming that the terms of the Contract were precise enough to shelter Esmor from liability *if it had performed in accordance with them,* the record amply supports Plaintiffs' assertions that Esmor simply did not live up to requirements of the Contract. The findings of the INS Report, along with testimony in the record, indicate that Esmor in fact failed to obtain even security clearance for many of its guards; that many guards did not receive required training; that training was inade-

quate, or even that training *itself* involved abuse of detainees; and that Esmor's supervision of its guards was drastically deficient. In addition, it is clear from the INS Report and from the testimony of guards and detainees alike that Esmor's practices, even if they did comply with the more detailed terms of the Contract—addressing matters such as security clearances and hours of training—did not necessarily comply with Esmor's overarching duty under the Contract to ensure the safety of detainees. In hiring, training, and supervising its employees, Esmor was required not only to abide by the detailed terms of the Contract, but also to fulfill its more general obligation of running the facility safely. It would defy logic to suggest that the INS could have "approved" practices that breached this larger duty.

### CONCLUSION

For the reasons stated above, the pending motions in *Brown* and *Jama* will be resolved as follows:

1. Esmor's motion for summary judgment in *Brown* will be granted with respect to Plaintiffs' claims under the U.S. Constitution and under 8 U.S.C. § 1362 (the Sixth Cause of Action in the Amended Complaint); with respect to their claims for breach of contract (the Fifth Cause of Action); and with respect to their claims of knowing, reckless, and intentional failure to properly screen, hire, train and otherwise manage employees (the Second Cause of Action). In all other respects the motion will be denied.[29]

2. In *Jama*

---

**28.** Further it is clear that a large portion of the training that Esmor employees received took place on the job. It is difficult to imagine how the INS could have approved such training in any real detail.

**29.** Accordingly, the claims in *Brown* that survive for trial will be the negligence claims (the First Cause of Action) and the respondeat superior claims (the Third and Fourth Causes of Action).

a. Plaintiff's claims against David McLean will be dismissed by consent.

b. Claims asserted by all Plaintiffs *except* the nine listed below will be dismissed without prejudice on account of their failure to opt out of the *Brown* class. The Plaintiffs whose claims survive are

Hawa Abdi Jama

Anantharajah Jeyakumar

Abu Bakar

Cecilia Kou Jeffrey

Abraham Kenneth [Kenneh]

Dennis Raji

Agatha Serwaa

Shamimu Nanteza

Sarah Tetteh Yower.

c. The motion by Esmor and Esmor Officers to dismiss claims asserted against Defendants who have not been served will be granted with respect to Defendants Hughes, Figel, Wilson, Phil, Mohammed, Michelle, Kutz, Hayes, Feder, and Edider.

d. The motion by Esmor and the Esmor Officers to dismiss claims against John and Jane Does 2–50 will be granted.

e. Claims against Defendant Vanderpuye will be dismissed on the Court's own motion for failure to prosecute.

f. All motions by Defendants to strike portions of Plaintiffs' opposition papers will be denied.

g. The motion by Professors of International Law for leave to appear as amici curiae will be granted.

h. All individual Defendants will be deemed to have amended their answers to assert the affirmative defense of qualified immunity.

i. Decision on all other pending motions in *Jama* will continue to be reserved.

An appropriate order will be entered.

## FURTHER PROCEEDINGS

Discovery having been completed in both the *Jama* and *Brown* cases, it is unnecessary to continue the consolidation of the two cases, which was for discovery purposes. The *Brown* case is now ready to proceed to a final pretrial conference, a settlement conference, and, if no settlement is reached, trial. The Magistrate Judge will be requested to schedule the final pretrial conference and settlement discussions. After it is determined how much of the *Jama* case remains after disposition of the summary judgment motions in that case, it can be determined whether some or all of the remaining issues might usefully be tried in conjunction with a trial in the *Brown* case.